## AUNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

### CIVIL ACTION NO. 3:12-CV-280-S

**ODELL BRACKENS, JR.**                                    **PLAINTIFF**
**As Personal Representative of the Estate**
**of Leon Brackens**


**vs.**            <u>**MEMORANDUM IN SUPPORT OF THE**</u>
            <u>**MOTION FOR SUMMARY JUDGMENT**</u>
            <u>**FILED BY DEFENDANTS LOUISVILLE JEFFERSON**</u>
            <u>**COUNTY METRO GOVERNMENT, STU HMAILTON,**</u>
            <u>**SAM MADISON, KEVIN HAMLIN, ROBERT ASHENFELTER,**</u>
            <u>**ROBERT WARD, MATTHEW GLASS, NATHANIEL HERNANDEZ,**</u>
            <u>**CHRIS MEREDITH, AND JAMES STEFFAN**</u>
            *(electronically filed)*


**LOUISVILLE/JEFFERSON COUNTY**
**METRO GOVERNMENT, *et al.***                          **DEFENDANTS**

********

Come the Defendants, Louisville-Jefferson County Metro Government ("Metro"), Stu Hamilton ("Hamilton"), Sam Madison ("Madison"), Kevin Hamlin ("Hamlin"), Robert Ashenfelter ("Ashenfelter"), Robert Ward ("Ward"), Matthew Glass ("Glass"), Nathaniel Hernandez ("Hernandez"), Chris Meredith ("Meredith"), and James Steffan ("Steffan") , by counsel, and in support of their Motion for Summary Judgment, state as follows:

## FACTS

On April 21, 2011, Jeffersonville police officers Moss, Ueding, and Schiller were conducting a felony traffic stop of a van driven by Rhonda Sullivan after determining that she had outstanding felony warrants for her arrest.  (Schiller Deposition[1], pp. 17 – 18.) As Officer Moss was standing at the driver's side door and attempting to speak with Rhonda Sullivan, she took off.  (*Id*., p. 18 and Exhibit 2 – Moss' In-car Video at 01:17:15.) During the pursuit, Sullivan created a risk of danger as she travelled through neighborhoods at a high rate of speed[2], travelled through a flooded area, and proceeded the wrong direction up the ramp and headed northbound on 31 South.   (Schiller Deposition, pp. 19, 22, and 52 – 53.) The pursuit continued through New Albany, onto the Sherman Minton Bridge and then onto the Watterson Expressway headed eastbound. (*Id*., p. 23.)

When the pursuit entered Louisville, the Louisville Metro Police Department ("LMPD") was notified that the Jeffersonville Police Department ("JPD") was involved in a pursuit.  (Exhibit 3 – Ashenfelter Profession Standards Unit ("PSU") statement, p. 3; Exhibit 4 - Madison PSU statement, p. 3; and Hamlin Deposition[3], p. 7.) As two different police agencies from two different states were involved in the pursuit, there was a gap in the radio communications.  (Madison PSU Statement, p. 6.)  The LMPD officers were

---

[1] Those portions of Schiller's Deposition relied upon for this motion are attached as Exhibit 1.

[2]2 Video from Moss' car shows the speeds reached in excess of 90 mph.  See Exhibit 2.

[3] Those portions of Hamlin's Deposition relied upon for this motion are attached as Exhibit 5.

receiving information directly from the LMPD dispatcher and were not in direct communication with Indiana. (Gillock Deposition[4], pp. 25 - 26.)

Dispatch in Louisville was advising the LMPD officers that both individuals in the van were wanted on felony warrants. (Exhibit 7 – LMPD Dispatch at 01:00 – 01:04.) Further, dispatch reported that the occupants of the van said they would "do suicide by cop and will attempt to run over police cars if they get in the way." (*Id*., at 02:27 – 02:32.) LMPD was also advised, via dispatch, that the male in the van had a prior charge of possession of a handgun and the female in the van was yelling that she's scared to death. (*Id*., at 02:08 – 02:14 and 04:48 – 04:50.) Officer Schiller testified that Jeffersonville dispatch also relayed that there was possibly a suicidal subject with a firearm inside the car. (Schiller Dep., p. 21.) Once the van came to a stop, LMPD officers were again advised to "use extreme caution" as the individuals were suicidal and homicidal. (LMPD Dispatch at 10:01 – 10:13.)

The pursuit finally ended when the van came to a stop at the Breckenridge Lane exit on I-264. (Moss' In-car video at 01:38:24; Exhibit 8 – Madison's In-car video at 01:38:26; and Schiller Deposition, p. 24.) When the pursuit ended, JPD officer Moss was directly behind the van. (Schiller Deposition, p. 25.) JPD officers Schiller and Ashabranner were also behind the van with LMPD officer Sam Madison off to the right rear of their vehicles. (*Id*., pp. 25 and 26; Madison's In-car Video at 01:38:26.) Lt. Grimm, now Chief Grimm, stopped his car in front of the van. (Schiller Deposition, p. 25.) Officer Schiller and Officer Moss approached the driver's side while Lt. Grimm and Officer Ashabranner provided cover. (*Id.*, p. 26.) The JPD officers ordered the driver,

---

[4] Those portions of Gillock's Deposition relied upon for this motion are attached as Exhibit 6.

Rhonda Sullivan, to get out of the car and she complied.  (*Id.*)  As Sullivan got out of the van, it rolled forward into Lt. Grimm's car. (Moss' In-car Video at 01:38:47.)  After directing her to lie on the ground, Officers Schiller and Moss approached and placed Sullivan in handcuffs.  (Schiller Deposition, p. 26.)   While she was being handcuffed, Lt. Grimm provided cover by pointing his weapon at the passenger, Leon Brackens, through the driver's side window.   (Moss's In-car Video at 01:38:56.)     After Sullivan was secured, Officer Schiller began making his way around the rear of the van and, on the video, is seen looking to Lt. Grimm to make sure he is providing cover for Officer Schiller.  (*Id.* at 01:39:09 – 01:39:14.)   Officer Schiller observed LMPD giving verbal commands to the passenger, but the passenger was not complying and not getting out of the car. (Schiller Deposition, p. 26.) As Officer Schiller proceeded around the rear of the van, he is seen on the video ducking down, holding his handcuffs, and looking to officers located at his right to make sure they are providing him cover.  (Moss' In-car Video at 01:39:16 – 01:39:19.)  At this point, an LMPD officer is observed on camera providing cover to Officer Schiller while Lt. Grimm is still covering the passenger from the driver's window.  (*Id.* at 01:39:19; Madison's In-car Video at 01:38:50.)  When Schiller got to the passenger side of the car, Brackens was still not complying with the directives given by the officers to get out of the car.  (Schiller Deposition, p. 27.)  Officer Schiller motioned to the LMPD officer and asked if the officer had him covered.  (*Id.*, at p. 27; Moss's In-car Video at 01:39:19 – 01:39:25 and Madison's In-car Video at 01:39:14 – 01:39:27.)  When the LMPD officer told Schiller that he had him covered, Schiller opened the passenger door.  (Schiller Deposition, pp. 27 and 28; Moss's In-car Video at 01:39:25 and Madison's In-car Video at 01:39:27.)   Schiller told Brackens to keep his hands

4

visible and he complied.  (Schiller Deposition, p. 28.)   Schiller then grabbed Brackens by his shirt but discovered he still had his seatbelt on.  (*Id.*, p. 29.)  Schiller removed the seatbelt, took Brackens out of the car, and put him on the ground. (*Id.*; Moss's In-car Video at 01:39:26 – 01:39:32; and Madison's In-car Video at 01:39:30 – 01:39:34.)   As Schiller was attempting to remove Brackens from the car, Gillock stepped in to assist. (Gillock Deposition, p. 31 and Madison's In-car Video at 01:39:34.)   At that time, Gillock holstered his weapon. (Gillock Deposition, p. 32.)   Gillock explained that the concern for his safety remained the same; however, not knowing the passenger or his intentions, Gillock did not "want to introduce a weapon" into that situation (*Id.*, p. 32, lines 10-12.)  Officer Schiller was the only officer that physically touched the passenger as he was removed from the car.  (Schiller Deposition, p. 29.)  After Schiller placed him on the ground, Officer Gillock assisted in rolling him over so they could place him in handcuffs.  (*Id.*, p. 33 and Moss' In-car Video at 01:39:33.) After Schiller placed the passenger on the ground, LMPD officers assisted in placing him in handcuffs.  (Schiller Deposition, p. 29.)   Officer Steffan approached after the passenger was on the ground and assisted by grabbing Brackens arm and putting it in a position so the other officers could place handcuffs on him.  (Exhibit 9 - Steffan PSU Statement, p. 4.)   Although Gillock's handcuffs were used, Gillock did not actually place the handcuffs on the passenger.  (Gillock Deposition, pp. 38 – 39.)   Handcuffs were placed on Brackens because the officers did not yet know what they were dealing with at that point; whether the passenger was a threat to them or whether anyone in the van had a weapon.  (Schiller Deposition, p. 35 and Gillock Deposition, p. 40.)   After he was secured, the officers attempted to stand Brackens up in order to conduct a pat down search for weapons.

(Schiller Deposition, pp. 30 – 31.)  It was at this point, that Brackens indicated he was disabled so Officer Schiller attempted to "place him up against the vehicle" in order "to check his immediate area to make sure that he didn't have any weapons on him." (*Id.*, p. 31, lines 3 – 5.)  Brackens then advised the officers that there was something wrong with his leg and Officer Schiller noticed that something was not right with one of his legs. (*Id.*, p. 31 and Gillock Deposition, p. 36.) At that point, the officers sat Brackens on the ground.  (Schiller Deposition, p. 31 and Moss's In-car Video at 01:40:45.)  Due to Brackens' medical condition, Sgt. Hamlin, as a precaution, contacted EMS.  (Hamlin Deposition, p. 16.)

EMT Joseph Allen responded to the scene along with his partner, Tom Schwartz. (Exhibit 10 – Allen PSU Statement, p. 3.)  Although Brackens complained of some shoulder and leg pain, they did not note any injuries.  (*Id.*)  Due to his complaints, they did place a splint to his left leg and right shoulder.  (*Id.*)  At that time, Brackens made no complaint that he had been assaulted by the police.  (*Id.*, p. 4.)  He was transported to University Hospital as a non-emergency.  (*Id.*, p. 5.)

On December 6, 2011, counsel for Brackens sent undersigned counsel a letter complaining of his treatment on the day of this incident.  (Exhibit 11.)  Subsequently, on December 20, 2011, interim Chief Ishmon Burks initiated a PSU investigation regarding the conduct of the officers on the night in question.  (Exhibit 12 – Letters to Officers – Chief's Findings.)  As part of that investigation, Dr. William Smock was requested to review the Mr. Brackens' medical records.  The following are Dr. Smock's findings:

1. Mr. Leon Brackens sustained fractures of his left proximal humerus and left distal femur when he was taken into custody after a police pursuit on April 21, 2011

6

2. Mr. Leon Brackens' fractures were accidental in nature and occurred due to the severe osteopenic state of his bones.

3. There is no evidence of any strikes or blows to Mr. Brackens during his removal from the right front passenger seat of the fleeing vehicle.

4. There is no evidence of excessive force being applied to Mr. Brackens during his removal from the right front passenger seat of the fleeing vehicle.

5. A past medical history of sickle cell anemia, severe osteopenia and hypertension.

(Exhibit 13 – Dr. Smock's Forensic Report.)  As a result of that investigation, the officers charged with violating the use of force policy were exonerated and the only sustained charges against any officer were due to policy violations regarding the failure to properly activate some or all of their recording equipment during the pursuit and the failure of one sergeant to complete some paperwork pursuant to policy.  (Exhibit 13.)

Although originally filed in Jefferson Circuit Court, this case was subsequently removed to federal court on May 25, 2012. (DN 1.)  On November 29, 2012, Plaintiff filed a Third Amended Complaint in which he alleged the following:

1. A violation of his Fourth and Fourteenth[5] Amendment rights when the "Defendants, without probable cause or justification used excess physical force, assaulted, battered, and falsely imprisoned Plaintiff Leon Brackens all to his detriment."  (DN 14 – Third Amended Complaint, ¶¶ 72, 74, and 75);

---

[5]"[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

2. Negligent training and supervision by LMPD and JPD and "deliberate indifference and inadequacy in the present scenario as 'closely related to' and/or 'actually caused' the Plaintiff's injuries." (*Id*., ¶ 77);

3. Conspiracy pursuant to 42 U.S.C. §1985 (*Id*., Count II);

4. State law claims consisting of excessive execution, assault, battery, false imprisonment; Official Misconduct in violation of KRS 533.030 and 522.030; Assault in violation of KRS 508.030; and Tampering with Physical Evidence in violation of KRS 524.100.  (*Id.*, Count III); and

5. Negligence and Vicarious Liability for the wrongful death of Brackens. (*Id*., Count IV.)

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, 'show that there is no genuine issue as to any material fact' such that 'the movant is entitled to judgment as a matter of law.'" *Villegas v. Metropolitan Government of Nashville*, 709 F.3d 563, 568 (6th Cir., 2013) quoting *Ventas, Inc. v. HCP, Inc*., 647 F.3d 291, 324 (6th Cir. 2011) (quoting Fed. R. Civ. P. 56(a).)  "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Barnes v. Kerr Corp*., 418 F.3d 583, 588 (6th Cir. 2005) quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-252 (1986.) "A dispute over a material fact cannot be 'genuine' unless a reasonable jury could return a verdict for the nonmoving party." *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 433 (6th Cir. 2005) citing to *Anderson*, 477 at 248.

"The burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by 'showing - that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.'" *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) quoting to *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986.) A plaintiff "may not rest upon mere allegations or denial of his pleadings, but…must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

In the case before this Court, Plaintiff has not and cannot put forth any probative evidence to establish a genuine issue of material fact to support his claims. Therefore this court must grant the Defendants' motion for summary judgment.

## **ARGUMENT**

### I.    **THE CLAIMS AGAINST OFFICER HERNANDEZ MUST BE DISMISSED AS HE WAS NOT PRESENT AT THE SCENE OF THIS INCIDENT NOR WAS HE INVOLVED.**

The first statement given by Officer Hernandez to PSU was on April 11, 2012. (Exhibit 14 – Hernandez 04-11-12 PSU Statement.)  Officer Hernandez testified that he did not recall being involved in this incident at all.  (*Id.*, p. 3.)  However, based upon a review of an in-car video, he thought he recognized himself on the video and therefore thought he had been present.  (*Id.*)  Despite his belief that he was present, he remained adamant that he did not "remember being there at all."  (*Id.*, p. 5.)   On August 9, 2012, Officer Hernandez returned to the PSU office for a second interview.  (Exhibit 15 – Hernandez 08-09-12 PSU Statement.)  By that time, LMPD had obtained a copy of the in-car video from JPD.  (*Id.*, p. 2.)  That in-car video was much clearer than the video previously viewed by PSU and Hernandez.  (*Id.*)   Based upon reviewing the new video,

9

they realized he was not the officer originally identified in the other video.  (*Id.*, p. 3.)  As Hernandez stated during his first statement, he again confirmed that he did not recall being present during this incident at all.  (*Id.*, p. 2.)  No one else has identified Hernandez as being present at the scene of this incident, or even working the night of this incident.

Plaintiff has failed to offer any evidence that Hernandez was present at the scene or involved in this incident.  Therefore, all Plaintiff's claims against Hernandez must be dismissed.

## II.   BRACKENS' CONSTITUTIONAL RIGHTS WERE NOT VIOLATED

It is well established that officers may conduct a brief investigative stop if they have reasonable suspicion that criminal activity is afoot. *U.S. v. Young*, 707 F.3d 598 (6th Cir. 2012) citing to *Terry v. Ohio*, 392 U.S. 1 (1968.)   Such stops are frequently referred to as "*Terry*" stops.  *Id.*  To conduct such a stop, "[t]he officer must have a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.*, at 603 quoting *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006.)  "[A] *Terry* stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Dorsey v. Barber*, 517 F.3d 389, 398 (6th Cir. 2008) quoting *United States v. Perez*, 440 F.3d 363, 372 (6th Cir. 2006) (quoting *Terry*, 392 U.S. at 20.)   Further, officers should use the "least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time."  *Dorsey*, 517 F.3d at 398 citing to *Perez*, 440 F.3d at 372.   If the "seizure exceeds the bounds of a permissible investigative stop, the detention may become an arrest that must be supported by probable cause."  *Dorsey*, 517 F.3d at 398 citing to *Smoak v. Hall*, 460 F.3d 768, 780 – 81 (6th Cir. 2006.)  However, "there is no litmus test for determining when the line is

crossed." *Id.*, at 399.  In determining whether a seizure has exceeded the acceptable bounds of the stop, Courts consider "such factors as the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is reasonably related to the basis for the original intrusion." *Id.*, citing to *Smoak*, 460 F.3d at 781.  "It is well-recognized that 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989.) When conducting "*Terry*" stops, officers are allowed to "draw their weapons and/or utilize handcuffs if those precautions are warranted." *Id.* citing to *Radvansky v. City of Olmstead Falls*, 395 F.3d 291 (6th Cir. 2005.)  Use of force is judged "from the perspective of a reasonable officer on the scene," not with the "benefit of 20/20 hindsight." *Id.* citing *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486 (6th Cir. 2007.)  As traffic stops "are 'especially fraught with danger to police officers,'" the Supreme Court has held that police officers may order the driver and passengers to get out of the car without violating the Fourth Amendment.  *U.S. v. Noble*, 762 F.3d 509, 521 (6th Cir. 2014) quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) and citing to *Maryland v. Wilson*, 519 U.S. 408, 414 (1997.) Further, during the traffic stop, an officer may perform a patdown of the driver and any of the passengers if the officer has reasonable suspicion to believe they may be armed and dangerous. *Id.*, at 521 citing to *Knowles v. Iowa*, 525 U.S. 113, 118 (1998.) Reasonable suspicion exists if "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger."  *Id.*, at 522 quoting *Terry*, 392 U.S. at 27.

In this case, the officers had more than reasonable suspicion to detain the van in which Mr. Brackens was a passenger. At the time the officers detained the van, there were outstanding warrants for the arrest of the driver, Rhonda Sullivan. (Schiller Deposition, pp. 17 – 18.) Further, upon initially attempting to detain the van, Sullivan stopped briefly, then fled from the police and a pursuit ensued. This was a pursuit that crossed state lines, involved a car travelling the wrong direction on roadways, and travelling at high rates of speed[6]. The officers from both JPD and LMPD recognized this to be a high risk stop and acted accordingly. (Schiller Deposition, p. 53.) A high risk stop is a stop in which there is a "high probability" of an assault against officers or others. (*Id.*, p. 53, lines 23-24.) In such a stop, there is concern that there might be a weapon in the car and there is the potential that the individual or individuals will fight or harm the officers or others. (*Id.*, Schiller Deposition, p. 54.)

Based upon the information the officers possessed at the time and the totality of the circumstances, the officers' decision to have their weapons drawn providing cover was reasonable. In *U.S. v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004), the Court found that it was reasonable for officers "to draw their weapons to prevent an escape" after attempting to stop individuals suspected of drug trafficking and their "vehicle lunged forward as if they were attempting to escape." In *Jacob*, the Court also recognized that "[t]he investigators' decision to order the defendants out of the vehicle as they approached the car and to handcuff them was also reasonable, as **concern for the investigators' safety was at its height under those circumstances**." *Id.*, at 579. (Emphasis added.) "[T]he degree of force utilized by officers during a detention must be

---

[6] During the pursuit, LMPD officers reported the speed at 93 mph. (LMPD Dispatch at 08:16 – 08:20.)

'reasonably related in scope to the situation at hand.'" *Id*., at 579 quoting *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001)(quoting *United States v. Hardnett*, 804 F.2d 353, 356-357 (6th Cir. 1986.)

Although, as it turns out, the police did not have probable cause to arrest Mr. Brackens, at the moment the van was initially detained, they did not know what role, if any, Mr. Brackens played in the pursuit. Dispatch reported to the officers that the male had a prior charge of possession of handgun and that the female was yelling that she was scared to death. (LMPD Dispatch at 02:08 – 02:14 and 04:48 – 04:50.)  The officers were further advised to "use extreme caution" when approaching the van because the individuals were suicidal and homicidal.  (LMPD Dispatch at 10:01 – 10:13.) Although it was determined later that it was the male, not the female, who was yelling that he was scared, the officers on the scene were unaware of that information at the time.  Based upon the information they possessed when they first confronted Mr. Brackens, they had reasonable suspicion to believe he was armed and dangerous. "In assessing reasonableness, we acknowledge 'that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Dorsey*, 517 F.3d at 399-400, citing *Williams*, 496 F.3d at 486 and *Graham*, 490 U.S. at 396-97.

Although it was later learned that Mr. Brackens suffered from a debilitating disease, the officers were unaware of that fact at the time they were attempting to remove him from the van. Although he apparently suffered from a broken leg and arm as a result of being removed from the van and handcuffed, that alone is insufficient to establish a constitutional violation.  In *Griffin v. Hardrick*, 604 F.3d 949, 955 (6th Cir. 2010), the

plaintiff suffered a broken leg following a properly executed "leg-sweep maneuver."  The Court held that "there is no basis whatsoever to infer that Hardrick intended to use such force as would break Griffin's leg.  The force that did so came solely from the unfortunate accident of Rutledge collapsing on Griffin as they both fell to the floor."  *Id.* In this case, the officers were acting properly when they determined it was necessary to remove Brackens from the car and place him in handcuffs given the totality of the circumstances and the potential threat to their safety.  The fact that he suffered injury as a result "came solely from the unfortunate" fact that Brackens, unknown to the officers at the time, suffered from a disease causing his bones to be extremely brittle.  (Dr. Smock's Forensic Report.)

Plaintiff has failed to establish that Brackens' Constitutional rights were violated, therefore, all his federal claims must be dismissed.

### III.   PLAINITFF HAS FAILED TO IDENTIFY THE OFFICERS HE ALLEGES CAUSED BRACKENS' INJURIES

Plaintiff has named numerous officers in this lawsuit; many of whom were not involved in the actual pursuit and/or never had any physical contact with Brackens. (Exhibit 16 – Responses of Hernandez, Glass, Ashenfelter, Hamlin, Madison, Hamilton, and Ward to Plaintiff's Requests for Admissions numbered 2 and 3.) Further, Plaintiff has failed to identify which officers allegedly caused Brackens' injuries. It is "only officers with direct responsibility for the challenged action [that] may be subject to §1983 liability."  *Wilson v. Morgan*, 477 F.3d 326, 337 (6th Cir. 2007).  "Each defendant's liability must be assessed individually, based on his or her own actions."  *Dorsey*, 517 F.3d at 399 citing *to Ghandi v. Police Dep't of the City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984.)

Plaintiff's claims of excessive use of force must be dismissed.

**IV.   PLAINTIFF HAS FAILED TO STATE A CLAIM OF CONSPIRACY PURSUANT TO §1985.**

Plaintiff asserts a claim under 42 U.S.C. §1985 by alleging that the "Defendants conspired to violate Plaintiff's Constitutional rights by setting the events into action, by depriving Plaintiff of his rights, and by many attempts to conceal their illegalities by tampering with evidence." (DN 14, Third Amended Complaint, ¶ 80.)  These allegations are insufficient to state a claim of conspiracy.  "Section 1985 is a provision of the Ku Klux Klan Act of 1871 and consists of" the following three subsections:  (1) "prohibits conspiracies to interfere with federal officers in the performance of their duties," (2) "prohibits conspiracies to influence parties, witnesses, or jurors in federal court proceedings," and (3) prohibits  "a conspiracy motivated by racial or other class-based discriminatory animus." *McGhan v. Kalkaska County Dept. of Human Services*, 2009 WL 2170151, at 13 (W.D. Mich., 2009) quoting *Fox v. Michigan State Police Dep't*, 173 F.App'x 372, 376 (6th Cir 2006); *Kush v. Rutledge*, 460 U.S. 719, 724 – 727(1983), *United Bhd. Of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 840 n. 1 (1983); *Griffin v. Breckenridge*, 403 U.S. 88 (1971) and 42 U.S.C.§1985(1), (2) and (3).   "Further, 'conspiracy must be pled with some degree of specificity and…vague and conclusory allegations unsupported by material facts will not be sufficient to state a claim.'" *Id.*, quoting *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007.)    In *Phat's Bar & Grill, Inc. v. Louisville Jefferson County Metro Government, et al.*, 2011 WL 560433, 3 (W.D. Ky. 2011), the court also found that the Plaintiff failed to allege any facts to support a claim of conspiracy and held:

"Section 1985 was established for claims based upon the denial of constitutional rights to a group of persons based upon their race.  In addition, subsection (3) does not create independent substantive rights, but does allow conspiracy claims for designated class-based violations."

Not only has Plaintiff failed to properly allege a claim of conspiracy, there is no evidence in the record to support such a claim.  Plaintiff's conspiracy claim pursuant to 42 U.S.C. §1985 must be dismissed.

### V.   PLAINTIFF FAILED TO STATE A §1983 CLAIM AGAINST METRO

When a §1983 claim is made against a municipality such as Metro, this court must analyze two distinct elements: (1) whether Plaintiff's harm was caused by a constitutional violation, and (2) if so, whether Metro is responsible for that violation. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). A municipality can be held liable under §1983 only when the municipality itself is responsible for the constitutional violation.  *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).  There is no *respondeat superior* or vicarious liability under §1983.  *Bd. of the City Commr. of Bryan County, Okla. v. Brown*, 520 U.S. 397 (1997). Accordingly, a municipality is not liable under §1983 unless it can be established that a police officer's actions were the result of an official municipal policy.  *Monell v. N.Y.C. Dept. of Social Services*, 436 U.S. 658, 694-95 (1978).  Locating a policy or custom ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body, or of those officials whose acts may fairly be said to be those of the municipality.  *Brown*, *supra* at 397.

To hold Metro accountable, therefore, Plaintiff must demonstrate that Bracken's Constitutional rights were violated and that an official policy or custom caused their

constitutional rights to be violated.  *Deaton v. Montgomery County, Ohio*, 989 F.2d 885, 889 (6th Cir. 1993).  Additionally, Plaintiff must prove that the policy or custom was the "moving force" behind the constitutional violation.  *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).  In short, they must "identify the policy, connect the policy to [Metro] itself and show that the particular injury was incurred because of the execution of that policy."  *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)).

If there is no constitutional deprivation, the §1983 claim must fail.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Smith v. Thornburg*, 136 F.3d 1070, 1078, n.12 (6th Cir. 1998); *Monday v. Oullet*, 118 F.3d 1099, 1105 (6th Cir. 1997). As has been established, Bracken's constitutional rights were not violated. Therefore, Plaintiff's claims against Metro must be dismissed.

Assuming, for purposes of this motion only, that Bracken's Constitutional rights were violated, Plaintiff has failed to establish that the actions of the officers were pursuant to a policy, custom or practice of Metro. Although Plaintiff alleges a failure to train or supervise against LMPD, there is no evidence in the record to support such a claim.

The federal claims against Metro must be dismissed.

## VI.     THE OFFICIAL CAPACITY CLAIMS MUST BE DISMISSED.

The claims against the officers in their official capacity are merely claims against Metro. See *Lane v. City of LaFollette, Tenn*., 490 F.3d 410, 423 (6th Cir. 2007) ("[C]laims against Defendants in their official capacity, are, in effect, claims against the City.")

Accordingly, for the same reasons Metro must be dismissed, so too must the official capacity claims against the officers be dismissed.  *Id.*

**VII.    METRO GOVERNMENT IS ENTITLED TO SOVEREIGN IMMUNITY ON PLAINTIFF'S STATE LAW CLAIMS**

Pursuant to KRS 67C101(2)(e),  Metro is "accorded the same sovereign immunity granted counties, their agencies, officers, and employees."  Further, in *Jewish Hosp. Healthcare Services, Inc. v. Louisville/Jefferson County Metro Government*, 270 S.W.3d 905, 906 (Ky. App., 2008), the Court specifically found that "Metro Government is entitled to sovereign immunity."

**VIII.   THE STATE LAW OFFICIAL CAPACITY CLAIMS AGAINST THE OFFICER MUST BE DISMISSED**.

When sued in an official capacity, the employee is "cloaked with the same immunity as the government or agency he/she represents."  *Schwindel v. Meade County*, 113 S.W.3d 159, 169 (Ky. 2003) citing to *Yanero v. Davis, et al*., 65 S.W.3d 510 (Ky. 2001) and *Franklin County v. Malone,* 957 S.W.2d 195 (Ky. 1997.) The government the LMPD officers represent is Metro.  As stated above, Metro is entitled to sovereign immunity on the state law claims.  Therefore, the LMPD officers, in their official capacities, are also entitled to sovereign immunity.

The state law claims against the LMPD officers in their official capacities must be dismissed.

**IX.    THE STATE LAW CLAIMS AGAINS THE OFFICERS MUST BE DISMISSED.**

Kentucky has recognized the authority of officers to conduct *Terry* stops. *Fletcher v. Com*., 182 S.W.3d 556 (Ky. App., 2005.)  Kentucky Courts have long held that police officers can temporarily detain someone to conduct a limited investigation if they have reasonable suspicion to believe that criminal activity may be "afoot."  See *Com. v. Priddy,* 184 S.W.3d 501, 505 (Ky., 2005) quoting *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989.)

For the reasons set forth in section   above, Plaintiff's claims of false imprisonment must be dismissed.

As discussed above, the actions of the officers in drawing their weapons and removing Mr. Brackens from the car were appropriate under the circumstances as the officers understood them.  "[T]he reality of the dangers encountered daily by police officers dealing with on-the-street confrontations, mandate that an individual's private interests be balanced against the protection of the officer." *Docksteader v. Com.*, 802 S.W.2d 149, 150 (Ky. App., 1992.) In *U.S. v. Lindsey,* 114 Fed.Appx. 718, 721-721, 2004 WL 2625066, 2 (6th Cir. 2004), the Court held that "[t]he actions of the officers in approaching Lindsey with guns drawn, ordering him to the ground, and frisking him did not transform the *Terry* stop into an arrest; what they did was reasonable to protect the safety of the officers and the public."     The precautions taken by the officers were "'reasonably related' to the investigation that warranted the initial stop." *Houston v. Clark County Sheriff Deputy John Does 1-5,* 174 F.3d 809, 814 -815 (6th Cir. 1999.)

Further, Plaintiff's claims of battery and assault must be dismissed. Not only has Plaintiff been unable to identify the individual allegedly responsible for causing injury to Mr. Brackens, at best Plaintiff has established that the officer or officers were negligent in causing his injury.  When an allegation involves police officers using unnecessary force during the course of an arrest, the proper claim is one of battery. See *City of Louisville v. Yeager,* 489 S.W.2d 819 (Ky. 1973). In *Yeager*, the Court held that assault and battery involves intentional conduct, not negligence.  See *Yeager*, 489 S.W.2d at 822.

Plaintiff has failed to establish a violation of KRS 524.100, Tampering with Physical Evidence.  The elements of that offense are:

      > "(1) A person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instituted; he:
>
> (a) Destroys, mutilates, conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding; or
>
> (b) Fabricates any physical evidence with intent that it be introduced in the official proceeding or offers any physical evidence, knowing it to be fabricated or altered.

KRS 524.100. Plaintiff has utterly failed to offer any evidence to support such a claim. Although in their Third Amended Complaint they assert there were delays in receiving records in response to their numerous requests pursuant to Kentucky Open Records Act, those allegations fail to establish that any of the named Defendants, or any other Metro employee, violated KRS 524.100. All video and audio recordings of the pursuit and all paperwork associated with this incident have been provided to counsel for Plaintiff through discovery. There is no evidence in the record to support a claim that anyone tampered with any of the physical evidence.

Plaintiff asserts a claim of Official Misconduct in violation of KRS 533.030 and 522.030. However, KRS 533.030 pertains to conditions of probation and conditional discharge; therefore it is inapplicable to the facts of this case. The elements of Official Misconduct in the Second Degree, as alleged by Plaintiff, are:

> (1) A public servant is guilty of official misconduct in the second degree when he knowingly:
>
> (a) Commits an act relating to his office which constitutes an unauthorized exercise of his official functions; or
>
> (b) Refrains from performing a duty imposed upon him by law or clearly inherent in the nature of his office; or

(c) Violates any statute or lawfully adopted rule or regulation relating
          to his office.

KRS 522.030.  For all the reasons set forth above, Plaintiff has failed to establish that any of the officers committed this offense.

Finally, Plaintiff has asserted a claim of wrongful death.  (DN 14 – Third Amended Complaint, ¶¶ 90 and 91.)  The record is completely void of any evidence that the actions of the Defendants on the night of this incident in any way contributed to the death of Mr. Brackens.  Mr. Brackens died on June 8, 2012, more than a year after this incident occurred.  (DN 8 – Notice of Death.)  Plaintiff's claim of wrongful death must be dismissed.

## X.     THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY

### 1.     The officers are entitled to qualified immunity on the federal claims.

In evaluating claims of qualified immunity, the Court must first "determine whether a constitutional violation has occurred; second [the court] determine[s] whether the right that was violated was a clearly established right of which a reasonable person would have known; finally [the court] determine[s] whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."  *Scott v. Clay County, TN*, 205 F.3d 867, 874 FN 9 (6th Cir. 2000) citing *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (quotations omitted; brackets added.) (Citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dickerson v. McClellan*, 101 F.3d 151, 1157-58 (6th Cir. 1996)).

"For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

*Hinchman*, 312 F.3d 205 quoting *Ewolski v. City of Brunswick,* 287 F.3d 492, 501 (6th Cir.2002.)  In light of pre-existing law, the unlawfulness of the action must be apparent. *Id*.

The burden of proof is on the Plaintiff to show that the defendant officers are not entitled to qualified immunity. *Scott,* 205 F.3d at 874, FN 9 quoting *Rich v. City of Mayfield Hts*., 955 F.2d 1092, 1095 (6th Cir. 1992).

> In other words, "for a plaintiff to make a successful §1983 claim, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Dickerson v. McClellan,* 101 F.3d 1151, 1158 (6th Cir.1996) (internal citation omitted). If a constitutional violation has occurred, then the plaintiff must assert "sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights." *Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir.1994).

*Waters v. City of Morristown*, 242 F.3d 353, 360 -361 (6th Cir. 2001).

The United States Supreme Court has held that "all but the plainly incompetent or those who knowingly violate the law" are protected by qualified immunity.  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "Immunity applies if reasonable officials could disagree on whether the public official could have reasonably believed that his conduct was lawful."  *Waters*, 242 F.3d at 361 citing to *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992.)

Court have previously held that "an officer who is merely present at a scene but is not directly responsible for the complained of action is entitled to qualified immunity from suit under § 1983." *Wilson,* 477 F.3d at 337 citing *Ghandi v. Police Dep't,* 747 F.2d 338, 352 (6th Cir.1984).   Further, if the information relayed by dispatch to the officers was inaccurate, but the officers relied on that information in good faith, they are entitled

to qualified immunity.  *Dorsey*, 517 F.3d at 404 citing to *U.S. v. Hensley*, 469 U.S. 221, 232-233 (1985.)

The officers are protected by qualified immunity and the federal claims against them should be dismissed.

> **2.      The officers are entitled to qualified immunity on the state law claims.**

The "law affords qualified immunity to the discretionary acts of peace officers performed in an official capacity, thereby shielding them 'from [] liability for good faith judgment calls made in a legally uncertain environment."  *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. App. 2007) quoting *Yanero v. Davis*, 65 S.W.3d 510, 521-523 (Ky. 2001.)  The burden is on the Plaintiffs to establish that the officers acted with bad faith.  In *Haugh*, the Court held that:

> "[t]o show that a peace officer acted in bad faith when making an on-the-spot judgment call, the complainant must demonstrate that the officer '**knew or reasonably should have known** that the action he took within his sphere of official responsibility would violate' the complainant's rights or that the officer 'took the action **with the malicious intention** to cause a deprivation of constitutional rights or other injury…."

*Haugh*, 242 S.3d at 686 quoting *Yanero*, 65 S.W.3d at 523.  (Emphasis in original.)

Further, the "qualified immunity inquiry [under §1983] is essentially identical to the qualified official immunity inquiry under state law," therefore; the defendant officers are is entitled to qualified immunity for the state claims for the same reasons they are entitled to qualified immunity on the federal claims. *Jefferson County Fiscal Court v. Peerce*, 132 S.W.3d 824, 837 (Ky., 2004).

The officers are protected by qualified immunity and the state law claims against them should be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff's Third Amended Complaint against Metro,

Hamilton, Madison, Hamlin, Ashenfelter, Ward, Glass, Hernandez, Meredith and Steffan

should be dismissed in its entirety.

Respectfully submitted,

MICHAEL J. O'CONNELL
JEFFERSON COUNTY ATTORNEY

BY: /s/ Lisa A. Schweickart_____
    LISA A. SCHWEICKART
    ASSISTANT COUNTY ATTORNEY
    FISCAL COURT BUILDING
    531 COURT PLACE, SUITE 900
    LOUISVILLE, KY  40202
    (502) 574-4048

    COUNSEL FOR STU HAMILTON,
    SAM MADISON, KEVIN HAMLIN,
    ROBERT ASHENFELTER, ROBERT
    WARD, MATTHEW GLASS,
    NATHANIEL HERNANDEZ, CHRIS
    MEREDITH, JAMES STEFFAN
    AND LOUISVILLE JEFFERSON
    COUNTY METRO GOVERNMENT

## **CERTIFICATE**

It is hereby certified that on October 15, 2014, the foregoing was filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record. It is further certified that a copy of exhibits 2, 7, and 8 were mailed on October 15, 2014 via first-class U.S. mail, postage prepaid to:


Daniel J. Canon
Garry R. Adams
Mellissa Eyre Yeagle
CLAY FREDERICK ADAMS, PLC
Meidinger Tower, Suite 101
462 S. Fourth Avenue
Louisville, KY 40202
*Counsel for Plaintiff*

Sean Ragland
Nicholas R. Hart
PHILLIPS PARKER ORBERSON & ARNETT PLC
716 West Main Street, Suite 300
Louisville, Kentucky 40202
*Counsel for Defendant Brian Gillock*

R. Jeffrey Lowe
Kightlinger & Gray, LLP
3620 Blackiston Blvd., Suite 200
New Albany, IN 47150
*Counsel for S. Moss, Rick Ashabranner,*
*Chris Grimm and J. Schiller*


/s/ Lisa A. Schweickart
LISA A. SCHWEICKART