Page 2

This deposition, under oath, of Sgt. Kevin Hamlin was taken by me, Tysie E. Milliken, Notary Public, on March 18, 2014, beginning at approximately 1:02 p.m., at the offices of Kightlinger & Gray LLP. Said examination was taken pursuant to Notice, for purposes of discovery, and as provided by the Kentucky Rules of Civil Procedure.

\*\*\* \*\*\* \*\*\*

APPEARANCES

FOR THE PLAINTIFF:   GARRY R. ADAMS, ESQ.
   CLAY DANIEL WALTON & ADAMS, PLC
   MEIDINGER TOWER, SUITE 101
   462 S. FOURTH STREET
   LOUISVILLE, KY 40202

FOR THE DEFENDANT:   LISA A. SCHWEICKART, ESQ.
   ASSISTANT JEFFERSON COUNTY ATTORNEY
   531 COURT PLACE, SUITE 900
   FISCAL COURT BUILDING
   LOUISVILLE, KY 40202
   SEAN RAGLAND, ESQ.
   PHILLIPS PARKER ORBERSON ARNETT, PLC
   716 WEST MAIN STREET, SUITE 300
   LOUISVILLE, KY 40202
   R. JEFFREY LOWE, ESQ.
   KIGHTLINGER & GRAY, LLP
   3620 BLACKISTON BLVD., SUITE 200
   NEW ALBANY, IN 47150

Page 3

INDEX
                                                    PAGE
EXAMINATION BY MR. ADAMS                              4
ERRATA PAGE (may or may not be requested)            31
CERTIFICATE PAGE                                     32

\*\*\* \*\*\* \*\*\*

EXHIBITS
                                                    PAGE
1. Complaint or Disciplinary History                 20
2. Letter to Sgt. Hamlin                             20
3. Professional Standards Unit Warning               22
4. Memorandum                                        28

Transcript Legend:
(ph) (Phonetically)
(sic) (In its original form)
... (Trailing off or did not complete thought)
- (Interjection of thought for clarification)
-- (Interruption of thought or s

Page 4

1   Sgt. Kevin Hamlin, a witness, called upon oral
2   examination by counsel for the Plaintiff, having been first
3   duly sworn, was examined and testified as follows:
4
5       EXAMINATION
6   BY MR. ADAMS:
7       COURT REPORTER: Sergeant Hamlin, would you raise your
8   right hand for me, please. Do you swear and affirm that the
9   testimony you are about to give to be the truth, the whole
10  truth and nothing but the truth, so help you God?
11      A. I do.
12      Q. Sir, please state your full legal name for the
13  record.
14      A. My name is Kevin – K-E-V-I-N – Hamlin – H-A-M-L-I-N.
15      Q. And what is your middle name, sir?
16      A. I do not have a middle name.
17      Q. And Sgt. Hamlin, before this deposition began, I
18  introduced you to myself. And I understand for the purposes
19  of this deposition, you want me to refer to you as Sgt.
20  Hamlin, correct?
21      A. That's correct.
22      Q. Sergeant. Hamlin, where are you from?
23      A. I am from Richmond, Virginia.
24      Q. Did you go to high school in Richmond, Virginia?
25      A. No, sir. I went to high school in New York.

Page 5

1       Q. And what city, town, county, in New York?
2       A. The Bronx, New York.
3       Q. And what high school?
4       A. Samuel Gompers (ph).
5       Q. And what year did you graduate?
6       A. 1978.
7       Q. And can you tell us what - what you're work history
8   was like after your graduation from high school in 1978, up
9   until the time you were hired at the Louisville Metro Police?
10      A. I graduated high school. I attended half a semester
11  at Long Island University, Brooklyn, New York. Then entered
12  the military also at the end of 1978.
13      Q. Which branch of the military, sir?
14      A. The Army.
15      Q. Thank you for your service. How long were you in
16  the Army?
17      MS. SCHWEICKART: He's trying to turn cell phone off, it
18  won't go off.
19      (WHEREAS A BRIEF BREAK WAS TAKEN)
20      Q. I believe the question on the table was - how long
21  were you in the Army?
22      A. I served active for twelve years, inactive for three
23  years.
24      Q. What did you do in the Army?
25      A. I was a telecommunications specialist.

Page 6

1  Q. And was that true during the period of time you were
2  inactive?
3  A. Well, I had various jobs while I was in the military
4  and yes, that is correct.
5  Q. And when you say, inactive, are you referring to the
6  reserve program in the Army has?
7  A. Yes, sir.
8  Q. And where were you living during the period of time
9  you were in the Army Reserves?
10 A. Fort Knox.
11 Q. During the period of time that you were in the
12 military, were you ever a military police?
13 A. No, sir.
14 Q. Where did you work during the period of time that
15 you were in the Army Reserves? Did you have other civilian
16 employment?
17 A. Yes, I worked at the E-town Police Department as a
18 dispatch.
19 Q. And during what time frame were you down there?
20 A. That would have been until 1992, December.
21 Q. And what did you upon, I guess leaving E-town Police
22 dispatch in 1992?
23 A. I joined the Louisville Police Department.
24 Q. Did you go to the academy at that point?
25 A. Yes, sir.

Page 7

1  Q. Richmond, Kentucky?
2  A. Yes, sir.
3  Q. And when did you graduate?
4  A. 1993.
5  Q. And when you started in 1993, were you a patrolman?
6  A. Yes, sir.
7  Q. And when did you become a Sergeant?
8  A. 2009.
9  Q. And what division were you in in 2009?
10 A. The 4th Division.
11 Q. How about April 2011?
12 A. I was assigned to the Traffic Division.
13 Q. How about today?
14 A. I'm still currently assigned to the Traffic
15 Division.
16 Q. And where is the Traffic Division located?
17 A. 3672 Taylor Boulevard.
18 Q. Do you recall the evening of April 21, 2011?
19 A. If you're referring to the date of this incident,
20 yes, sir, I do.
21 Q. Okay, and I am. Tell me when you were first made
22 aware of the pursuit or the chase on April 21, 2011?
23 A. I was seated in my office and the radio dispatch
24 stated that Indiana Police were in pursuit of a vehicle and
25 may possibly be headed our way. When I say, "our way", I

Page 8

1  mean coming – traveling on 65 towards the Kennedy Bridge.
2  Q. Okay. I've noticed in a lot of the documentation,
3  it is your belief that the chase came down 65 across the
4  Kennedy Bridge. I believe the testimony of all the Indiana
5  officers, which is confirmed on the dash cam is they came
6  across the Shermin Minton Bridge on 64. You have any
7  knowledge one way or the other that that's the way the
8  pursuit came into Jefferson County?
9  A. No, sir I don't.
10 Q. As far as what you heard that evening on radio
11 dispatch, do you recall LMPD dispatch saying anything
12 specific about the occupants of the vehicles -- of the
13 vehicle, I'm sorry?
14 A. The best of my knowledge, it was stated that there
15 was a female driver and that there were felony charges.
16 Q. And do you recall if - if the felony was
17 specifically identified?
18 A. I don't recall.
19 Q. Do you recall anything specifically being said about
20 the passenger?
21 A. Not at this time.
22 Q. At some point in time prior to the stop, do you
23 recall dispatch saying anything about the passenger?
24 A. No, sir.
25 Q. On the evening in question, were you aware that the

Page 9

1  passenger was a victim and had called 911?
2  A. No, sir.
3  Q. Okay. Let's go back to the chronology and I'm sorry
4  I had some follow-ups. You said you were in the office, you
5  heard from radio dispatch that the Indiana police were in
6  pursuit of a vehicle that may possibly be headed our way,
7  correct?
8  A. Yes, sir.
9  Q. So, what did you do in response to that information?
10 A. I was in the office with my two officers that were
11 working for me at that time, which would have been Officer
12 Maddison and Officer Lettie. We hesitated for a moment
13 because to the best of my knowledge, it had not gotten into
14 Kentucky yet and we were just waiting to see which way it was
15 going to go. Once I heard that it was coming on 65, that it
16 was traveling southbound on 65, Officer Maddison and Officer
17 Lettie then left the division in order to post up in the
18 event that - again, it came our direction.
19 Q. When you say post up, are you talking to staging
20 somewhere?
21 A. Yes, sir.
22 Q. Do you recall where they were staged?
23 A. I don't know exactly where they were staged, but
24 typically when a pursuit comes out of Indiana the suspects
25 will normally travel 65 southbound would then get on 264

Page 14

1 travel and speed.
2 Q. And is that normally done by secondary unit in a
3 pursuit?
4 A. Normally it is, so that the primary unit can
5 concentrate on the pursuit itself.
6 Q. Was anyone designated as primary unit that evening
7 from LMPD?
8 A. No.
9 Q. As far as being on the channel that you were
10 listening to were you listening to Sam's – the information
11 about the speed, direction of travel, do you know who else
12 was on that channel from LMPD?
13 A. Sam was the only one on our channel.
14 Q. Okay, so it was you and Sam. Did Officer Lettie
15 ever say anything on that channel?
16 A. Not that I can recall.
17 Q. Okay. So it was just Sam and you, correct?
18 A. Well, actually just Sam at that time. I mean, we
19 were just listening.
20 Q. Did Sam communicate anything about the driver or the
21 passenger during that period of time that you were listening?
22 A. Not that I recall.
23 Q. And can you tell me what happened when you arrived
24 on the scene on Breckenridge Lane where the vehicle was
25 stopped?

Page 15

1 A. I pulled up – if I may start again – when I got
2 there, there was a lot of police cars.
3 Q. Can you estimate for the record?
4 A. Eight maybe. And versus coming to the back of what
5 was a lot of police cars plus some still coming, I went
6 around the side and pulled up towards the front.
7 Q. Were you on the right side of the white van or the
8 left side?
9 A. I was on the left side. If I may just add to this,
10 I'm the traffic sergeant and it's our responsibility to take
11 any collision reports involving city equipment. So, aside
12 from whatever else was going on, my responsibility of course,
13 knowing that this was a pursuit was - was any damage to
14 equipment because that would have been our responsibility to
15 take the report. When I arrived on scene, my first question
16 of course was - was anybody hurt. My second question was -
17 was any equipment damaged. I was told no on both counts. I
18 can see the Indiana car that was one that was directly in
19 front and then there was the van directly behind and they
20 were – the bumpers were all butt touching. I walked around
21 the vehicles, around the backside and again, I was speaking
22 to officers that were there and basically asking, is anybody
23 hurt? Is any equipment damaged and as I stated, the answer
24 to both was no.
25 Q. Do you recall what specific individual told you

Page 16

1 that?
2 A. No, sir, I don't.
3 Q. Okay and at the point in time when you got there,
4 were the occupants still in the vehicle or were they out of
5 the vehicle?
6 A. When I gave my first statement, I stated that – I
7 knew the driver wasn't in the vehicle. I stated that the
8 passenger was seated inside the vehicle, but I was mistaken.
9 The passenger was actually being – was seated on the ground.
10 Someone told me that he had some type of medical condition
11 and words colostomy bag keeps coming to mind. I looked at
12 him. He looked like he was elderly. He looked to be of
13 course much older than he actually is and he looked like - he
14 just looked scared and like he was straining, so it was at
15 that time that I called EMS as a precaution.
16 Q. Do you recall what you told EMS?
17 A. I can't remember my exact words, but I may have said
18 something to the -- I think I said something to the effect of
19 I have an elderly man here and I wanted them to come and
20 check him out as a precaution.
21 MR. ADAMS: Can we go off the record for a second?
22 COURT REPORTER: Off the record.
23 (WHEREAS A BRIEF BREAK WAS TAKEN)
24 COURT REPORTER: On the record.
25 BY MR. ADAMS:

Page 17

1 Q. Alright Sergeant, tell me everything that you did at
2 the point in time where you called EMS going forward.
3 A. I looked around to see if there was another CO,
4 Sergeant or above at the scene.
5 Q. And just for the record, CO is a Commanding Officer?
6 A. Yes, sir.
7 Q. Okay. And did you see anybody else?
8 A. Yes, I did. I saw Sergeant Matt Glass and Sergeant
9 Stewart Hamilton.
10 Q. Did you have any conversations with Sergeant Matt
11 Glass or Sergeant Stewart Hamilton?
12 A. Yes, I did. We spoke briefly and we were deciding
13 who was gonna fill out the administrative incident report.
14 Q. And that's referred in this documentation as the
15 AIR, correct?
16 A. Yes, sir.
17 Q. Was there a consensus that was reached on who was
18 gonna fill that document out?
19 A. No. There was not a consensus as to who was gonna
20 fill it out, only who wasn't.
21 Q. Can you tell me what you recall about that
22 conversation?
23 A. Traffic was - did not initiate this pursuit. The
24 only role in which we played was that Officer Lettie searched
25 the female prisoner. Sam Maddison called off, but he did