IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ODELL BRACKENS, JR.
As Personal Representative of the
Estate of Leon Brackens

    Plaintiff

v.

LOUISVILLE-JEFFERSON COUNTY
METROPOLITAN GOVERNMENT, et al.

    Defendants

CASE NO. 3:12-CV-00280-CRS

**PLAINTIFF'S CONSOLIDATED RESPONSE TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Comes the Plaintiff, by counsel, and for his Response to Defendant's Motions for Summary Judgment states as follows:

**FACTUAL BACKGROUND**

**A.    EVENTS OF APRIL 21, 2011**

This suit arises out of the unreasonable search and seizure of Leon Brackens on April 21, 2011. On that day, Mr. Brackens was the unfortunate victim in a police chase that began in Jeffersonville, Indiana and ended on the streets of Louisville, Kentucky. The incident began when Defendant Moss, a Jeffersonville Police Officer, initiated a traffic stop of a vehicle after running its plates and finding that the registered owner, Rhonda Sullivan, had two outstanding warrants: one for theft in Indiana and one for a probation violation in Kentucky. (Moss Affidavit ¶ 4-5.)[1] Prior to the stop, Officer Moss called for backup and was

---

[1] Exhibit 4 to Defendants Moss, Ashabranner, Grimm, and Schiller's Motion for Summary Judgment ("JPD's Motion")

assisted by other officers in performing the traffic stop in Indiana. (*Id.* at ¶ 6.) Officer Moss approached Ms. Sullivan's vehicle and she identified herself and told Moss that she was just giving the passenger, Mr. Brackens, a ride. (Moss In-Car Video 1:16:50 – 1:17:10)[2]. When asked to exit the vehicle, Ms. Sullivan drove off. (*Id.* at 1:17:15) Officer Moss, along with at least four other Jeffersonville Police Department ("JPD") officers initiated the pursuit of Ms. Sullivan. (Officer Schiller Deposition,[3] at 18-19 and Affidavit of Ashabranner, at ¶ 2.[4]) Mr. Brackens, a helpless passenger, was trapped in the police pursued Ms. Sullivan through Southern Indiana and the Louisville Metro area. In their recitation of the facts, Defendants failed to include that during the pursuit, Mr. Brackens called 911 on his cell phone several times in hopes that police would be able to save him. You can hear Mr. Brackens' repeated cries for help and pleas for his life on the 911 recording. (A copy of which is attached as Exhibit 1 – Brackens 911 Call.) In his call to LMPD, Brackens is fairly calm and tells the operator that he is scared and there is nothing he can do to make her stop.[5]

It is undisputed that Jeffersonville Police Officers Schiller, Moss, Ashabranner, and Grimm pursued Ms. Sullivan into Louisville, Kentucky. Further it is undisputed that LMPD officers joined the pursuit once in its jurisdiction and Ms. Sullivan eventually stopped the vehicle on I-264 at Exit 18, which is Breckinridge Lane. Additionally, Plaintiff does not dispute Defendants' recitation of the facts in LMPD's Motion from the time the pursuit

---

[2] A copy of Moss' In-Car video was attached as Exhibit 2 to Memorandum of Support of the Motion for Summary Judgment filed by Louisville-Jefferson County Metro Government, Hamilton, Madison, Hamlin, Ashenfelter, Ward, Glass, Hernandez, Meredith, and Steffan ("LMPD's Motion")

[3] A copy of Officer Schiller's complete deposition taken on March 18, 2014, was attached as Exhibit 2 to JPD's Motion.

[4] Exhibit 6 to JPD's Motion.

[5] On the audiotape, the operator tell Mr. Brackens that she will put him on hold and someone else will pick up. This audio, if it exists, was not provided to Plaintiff.

ended in Louisville, Kentucky until the moment Mr. Brackens is brought out of the vehicle. (LMPD's Motion, p. 3-4; Moss Video 1:38:25 to 1:39:25). However, Plaintiff disputes the following material facts, which preclude summary judgment: (1) Defendants' characterization of the pursuit, (2) Defendants' characterization of the subsequent seizure of Mr. Brackens, (3) Defendants' actions with regard to the search and seizure of Mr. Brackens and (4) Defendants' knowledge at the time of the search and seizure of Mr. Brackens.

Defendants claim that Ms. Sullivan created "a substantial risk of injury or death to other motorists and pedestrians." (JPD' Motion p. 3-4.) However, they omit the undisputed fact that there was little to no traffic for much of the pursuit. (*See* Moss In-Car Camera; Schiller Depo. at 45-46; and Exhibit 3 – JPD Dispatch Audio). The pursuit reached speeds of 90 m.p.h. while on the highway with no traffic. (Exhibit 3 – JPD Dispatch Audio.) Additionally, Defendants fail to mention that Ms. Sullivan was going approximately 20 m.p.h. when she went over the median into oncoming traffic and passed only three vehicles. (Moss In-Car Video 1:17:45 to 1:17:50 and Schiller Depo. at 45.) Officer Glass, who provided cover for other officers after the vehicle stopped and during the seizure of Brackens, described the end of the pursuit as follows: "[the] pursuit wasn't at a high speed, it wasn't real erratic, minimal traffic, she just came to a stop. There wasn't any real drama. … it was just an uneventful, it was very low-key, for it to be a pursuit it probably couldn't have been a lower, uh, I guess alert level you know…" (Exhibit 4 – Glass PSU Statement, p. 6, 8).

Additionally, Defendants fail to appropriately put this incident in context. In order to appreciate the circumstances surrounding this pursuit and subsequent seizure of Mr.

3

Brackens, the Court must keep in mind the plethora of police officers involved. Once Ms. Sullivan's vehicle came to a stop at Breckinridge Lane, at least four JPD officers and fifteen LMPD officers were on the scene – three of which were armed and aiming their weapons at Brackens.[6] It is undisputed that Brackens did not resist while he was being seized.

Upon Ms. Sullivan's vehicle coming to a stop, officers immediately descended upon it. (Moss In-Car Video, 1:38:50 to 1:38:55). Interestingly, the manner in which the two occupants of the vehicle were treated was very different. Only two officers, Schiller and Moss, handcuff Ms. Sullivan. (Schiller Depo., 26.) Whereas, at least four officers use force to handcuff Mr. Brackens. (Moss In-Car Video 1:39:30 to 1:39:45.) Once Schiller handcuffed Ms. Sullivan, he moved around to the passenger side, opened the front passenger door, and he and Officer Gillock grabbed Mr. Brackens and pulled him to the ground. (Moss In-Car Video, 1:39:10 to 1:40:00). Although Defendants claim Schiller "placed" Mr. Brackens on the ground, Officer Ashenfelter, who was armed and providing cover, described that the takedown "looked violent." Ashenfelter PSU Statement, p. 6. Despite Mr. Brackens not resisting Officers Schiller and Gillock while they were handcuffing him, once Mr. Brackens is on the ground, at least two other officers pounce on him. (Moss In-Car Video 1:39:30 to 1:39:45.) In LMPD's Motion, Defendants identify only one additional officer, LMPD Officer Steffan, who admits to "grabbing Brackens arm and putting it in position so other officers could place handcuffs on him." (LMPD's Motion, p. 5.)[7] Additionally, JPD Defendants claim that only Officer Schiller was involved in the seizure and search of Mr. Brackens. (JPD's

---

[6] See JPD Officers' Affidavits, attached as Exhibits 4-6 to JPD's Motion; and Moss In-Car Video 1:39:20 for officers with firearms drawn. The number of LMPD officers was derived from a summary of PSU Statements contained in LMPD's PSU Investigative File provided during discovery, which is not attached hereto due to its size. Should Defendants or this Court request that a copy of the file be attached, Plaintiff will gladly supplement this brief.
[7] Citing its Exhibit 9 – Steffan PSU Statement.

4

Motion, p.8.)[8] However, Officer Ward, who was covering Gillock with a shotgun. PSU Interview claims that it was Indiana officers along with a couple of Metro officers who took down Brackens and handcuffed him. (Exhibit 10 - Ward PSU Statement p. 4,5)

Hernandez and Meredith both dispute their involvement with regard to the force used against Mr. Brackens. Despite Defendants' claim in the LMPD's Motion that Herenandez merely recognized himself and thought he was present after viewing a video of the incident, Hernandez actually initially identifies himself as one of the officers who physically touched Mr. Brackens. (Exhibit 6 – Hernandez PSU Statement, April 11, 2012, p. 4.) However, he later recants after watching Moss' In-Car Video. Specifically, during his Public Standards Unit ("PSU") Interview on April 11, 2012, Hernandez stated that "they pulled the passenger out, I helped secure an arm." *Id*. During a later PSU interview on August 9, 2012, he says he doesn't recall being present and that he and another officer have a similar appearance. (*Id*. at Hernandez PSU Statement, August 9, 2012, p. 4.)

LMPD's Motion entirely ignores Officer Meredith's admitted involvement. Meredith was interviewed by PSU on three occasions and each time he gave a different story regarding his involvement. During his first interview on March 6, 2012, he denied involvement and stated that there were "Jeffersonville officers that were actively involved in the actual taking the suspects into custody." (Exhibit 7 – Meredith PSU Statement, March 6, 2012, p. 3.) During his second interview on August 15, 2012, Meredith states that he "approached the vehicle as officers were taking Brackens out of the vehicle. He looked into the vehicle with a flashlight for other passengers, and he kneeled down to see if they needed assistance." (*Id.* at Meredith PSU Statement, August 15, 2012, p.4.) During his third

---

[8] Citing the tendered Affidavits of Moss, Ashabranner, and Grimm.

5

interview, Meredith again changes his story with regard to his level of involvement. Meredith states that when he kneeled down, he assisted them in getting his arm behind his back and his hands cuffed, and when he did so he could have leaned against him. (Exhibit 7 – Meredith PSU Statement, August 29, 2012, p. 3-4.) However, based on Officer Meredith's statements in his final PSU interview, he is likely the officer that is seen kneeling down on Brackens head, after Schiller and Gillock have brought Brackens to the ground and are handcuffing him. (Moss In-Car Video, 1:39:33 to 1:39:45.) Again, Defendants leave out these facts entirely from their Motions.

Plaintiff also disputes Defendants' recitation of the facts as it relates to the treatment of Mr. Brackens once he was handcuffed. LMPD's Motion recounts that the "officers" attempted to "stand" Brackens to conduct a patdown search. (P. 5-6.) Defendants also claim that it was Officer Schiller who pushed Mr. Brackens up against the vehicle. However, from the video, it is apparent that many Officers, not only once, but twice pushed Mr. Brackens against the van, even after it was clear that he could not stand on his own. (Moss In-Car Video 1:39:55 to 1:40:40 and Schiller Depo., 30-31.) During this time, officers gather an unidentified officer in a blue shirt attempts to block the camera's concealing the officers' treatment of Brackens. (*Id.* at 1:40:00.) After being tackled to the ground by several officers, his face being pushed by an Officer's knee into the pavement, and pushed up against the van twice, Brackens is finally seated and leans on Officer Gillock for support, where he remained handcuffed until EMS arrives. (*Id.* at 1:39:30 to 1:43:14.)

Additionally, there are disputed issues of material fact with regard to the information the officers possessed during the pursuit and at the time they searched and seized Mr. Brackens. At Mr. Schiller's deposition, in response to Mr. Adams questioning

6

regarding the information received concerning the occupants of the vehicle Mr. Schiller stated, "If I remember correctly, and again, I could ... my memory could be – I could be wrong. I believe we were getting information that there was possibly – possibly a suicidal subject with a firearm inside the vehicle." *Id*. at 21:15-20. When asked about when he was informed of this information, Mr. Schiller could not recall: "I don't recall exactly where – where or when that information came from." *Id.* at 25:12-20. Schiller makes no mention of this information in is report, which was completed on the night of the incident. Additionally, his statements are contradicted by the JPD audio, which shows that no such information was relayed to JPD officers. (Exhibit 3, JPD Dispatch Audio.) Moreover, Schiller was not in contact with LMPD dispatch so he cannot rely on any information LMPD may have dispatched. (Schiller Depo. at 38:23-39:2.)

The JPD audio shows that the primary information JPD officers may have been given was Rhonda Sullivan had prior charges of possession of a handgun, escape second, a probation violation, and theft. The only other pertinent information regarding Ms. Sullivan or Mr. Brackens that may have been given by JPD dispatch was that the "subjects calling 911 saying they're going to die" at the beginning of the pursuit and approximately 15 minutes later that the occupant was on the phone with LMPD trying to negotiate. (JPD Dispatch Audio at 8:25 – 8:40, 23:00 – 23:10.) Just moments later, the pursuit ended peacefully when Ms. Sullivan stopped on the Breckinridge Road exit from Highway 264. Most of the JPD Dispatch Audio is devoted to calling out locations and the speeds.[9] There was no information dispatched about Mr. Brackens or his possible threat to officer safety.

---

[9] At one point, it is relayed that the pursuit reached 90 m.p.h.; however, the audio makes clear there was no traffic and they were travelling on a major highway. JPD Audio, 12:30 – 12:35.)

7

At some point during the pursuit, LMPD's MetroSafe contacts New Albany Police regarding the pursuit as Ms. Sullivan and JPD officers are entering Louisville is told "we had a male passenger in the vehicle call 911 frantic because the female driver." (Exhibit 8 - MetroSafe Call 0132.49.) Again, Defendants completely ignore Brackens' 911 calls and evidence that they attempted to conceal this incident.

LMPD officers have given conflicting stories as to what information was relayed. During his PSU Interview, Gillock says that both occupants had called 911 and were saying that "the other one had 'em in the vehicle and kinda implying that they were kinda being taken against their will but it was unclear with what we were receiving over the radio, um, basically all we knew is Indiana was chasing a van through the jurisdiction and Traffic was assisting with it so, uh, we got up there, that way there could be marked cars." (Gillock PSU Interview, p.5.) He did not recall that the run involved weapons of any kind. *Id*. at 6.

LMPD Officer Steffan, who admits to assisting in cuffing Mr. Brackens, does not know what the initial chase was over. (Exhibit 9 – PSU Statement of Officer Steffan, P.6.) Moreover, LMPD Officer Ward claims that "Information came out from dispatch, uh, wasn't really clear on why Indiana was pursuing, uh, I thought I heard that they had ran over an officer or had run from an officer or something to that effect, so other than that we had no information on what the pursuit was about or who was in the vehicle at the time." (Exhibit 10 - Ward PSU Interview, p. 3.) Officer Meredith changed his story with regard to what he heard from dispatch. During his first interview, he stated: "as I recall from radio transmission I don't remember the exact details but I believe the lady had called dispatch during the pursuit and advised them that she was armed, uh, and given it was an armed situation I did follow behind the pursuit at some distance…" (Exhibit 7 – PSU Statement on

8

March 6, 2012, p.2. During his second interview, he changes story and says that "someone in the vehicle advised that they might, they would possibly shoot someone if police didn't stop chasing them so I think it was, I know it was in my mind that there was probably a weapon in that vehicle and the goal was to take all the occupants into custody as quick as possible." (Exhibit 7 – PSU Statement on August 15, 2012, p. 4-5.) At least one LMPD officer refused to participate in the pursuit because he "couldn't get a straight answer as to why exactly they were chasing 'em whether it be a felony or not" so he did not allow his people to participate. (Exhibit 11 – PSU Statement, p.3.)

### B. DEFENDANTS' CONCEALMENT OF APRIL 21, 2011 EVENTS

Plaintiff, through counsel, investigated the incidents that occurred on April 21, 2011, and was met with frequent attempts by Defendants to conceal the truth. Beginning in May of 2011 and continuing through September, Plaintiff submitted multiple Open Records Requests pursuant to KRS 61.870 et seq.[10] During this time, Defendants repeatedly stalled and refused to turn over any records requested.

On or about May 11, 2011, Plaintiff was told that the requested records were not yet available. In a pursuit that involved at least 15 LMPD officers, on or about May 24, 2011, LMPD informed Plaintiff's counsel that there was only <u>one</u> document that was responsive to Plaintiff's request for "any and all documentation/records/notes/investigations/-files surrounding the pursuit, arrest and extradition (if applicable) of Rhonda S. Sullivan on or about April 21, 2011, including but not limited to all dispatch audio" and that Metro Safe was unable to locate any dispatch audio due to "insufficient information." Exhibit 12.

---

[10] A copy of those requests and LMPD's responses are attached collectively as Exhibit 12.

Again in September of 2011, Plaintiff was told that LMPD was not in possession of any records responsive to the request for "any and all documentation, including, but not limited to, dispatch logs, records, audio recordings, e-mails, run logs, dashboard camera videos, charts, outgoing calls, which in any way related to the attached run on April 21, 2011." *Id*. However, in October, LMPD finally released to Plaintiff twenty-five pages of documentation as well as a CD that was responsive to the September request. On or about November 9, 2011, LMPD also released another CD to Plaintiff, which was responsive to the same September request. *Id*. Moreover, despite Defendants' dashboard video evidencing LMPD officers using force against Mr. Brackens, no use of force form has ever been produced, which is in violation of their SOPs. Plaintiff did not uncover any additional information regarding the incident that gave rise to Mr. Brackens' injuries until LMPD finally conducted a Personal Standards Unit investigation into this matter in January of 2012. Such behavior is indicative of an overall scheme to cover-up the events of April 21, 2011.

Ultimately, Mr. Brackens was not arrested in connection with the events of that morning, yet he sustained severe injuries due to Louisville Metro police officers' excessive use of force against him. Mr. Brackens suffered a fractured femur, a fractured humerus, and other injuries as a result of the assault on April 21, 2011. For months after the incident, Mr. Brackens was hospitalized, underwent multiple surgeries, and was no longer able to care for himself. Upon release from the hospital, he lived in a nursing home.

As a result of Defendants' actions set forth above, Plaintiff brought claims under 42 U.S.C. 1983 for unreasonable search and seizure, and LMPD's failure to train and/or supervise its officers; 42 U.S.C. 1985 for conspiracy to violate Brackens' rights and

attempting to conceal the illegalities by tampering with physical evidence; and Kentucky state law claims for excessive execution, assault, batter, false imprisonment, and official misconduct pursuant.[11] As the pivotal facts of the case are in dispute, this Court must deny the Defendants' Motions for summary judgment.

## ARGUMENT

### I. STANDARD OF REVIEW

Summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494, 498-499 (6th Cir. 2006.) "A dispute over a material fact cannot be 'genuine' unless a reasonable jury could return a verdict for the nonmoving party." *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 433 (6th Cir. 2005) citing to *Anderson*, 477 at 248. In this case there are genuine issues with regard to material facts, and it is possible that Plaintiff could prevail at trial. A jury could very well find that the actions of the Defendants rise to the level of a violation of the Mr. Brackens' constitutional rights. The evidence is not so one-sided that a reasonable jury could not return a verdict for the Plaintiff. Because genuine issues of material facts exist, summary judgment is inappropriate.

### II. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY REGARDING PLAINTIFF'S §1983 CLAIMS

---

[11] Plaintiff also brought a claim of wrongful death; however, Plaintiff stipulates that there is insufficient evidence in the record to establish causation.

11

In determining whether a defendant is entitled to qualified immunity, Courts engage in two inquiries: (1) taken in the light more favorable to the Plaintiff, do the facts show that the officer's conduct violated a federal right and (2) was that right "clearly established" to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful. *Saucier* v. *Katz*, 533 U. S. 194, 201(2001).

### A. SUMMARY JUDGMENT IS IMPROPER AS ISSUES OF MATERIAL FACT EXIST REGARDING DEFENDANTS' VIOLATION OF BRACKENS' CONSTITUTIONAL RIGHTS

When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. *Graham v. Connor*, 490 U. S. 386, 394 (1989). The reasonableness of a particular seizure is evaluated by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.*, at 396. Relevant factors to consider in evaluating what level of force is reasonable include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. However, those are not the only factors to consider and the ultimate inquiry is whether the seizure was reasonable under the "totality of the circumstances." *Id*.

The federal right at issue here is the right, secured by the Fourth Amendment, to be free from excessive force during seizure. It is undisputed that Brackens was seized when he was pulled from the vehicle and placed in handcuffs. Plaintiff contends that Defendants violated Mr. Brackens' constitutional rights when (1) Defendants Schiller and Gillock used excessive force to effectuate the seizure by pulling Brackens out of vehicle in a violent

manner while he was held at gunpoint; (2) multiple officers pounced on him while he was not resisting; (3) Officer Meredith kneeing him in the face when he was on the ground not resisting; (4) pushing him up against the van not once, but twice, while they "searched" him; (5) using handcuffs to detain Brackens after they "searched" him and determined he was handicapped and posed no risk.

As issues of material fact exist, the resolution of which are necessary to determine what actions the officers took against Brackens and the reasonableness of their actions, summary judgment is inappropriate. Defendants cite to *Scott v. Harris*, 550 U.S. 372, 378 (2007), and claim that because there is video evidence in this case, the Court must ignore Plaintiffs' version of the facts. JPD Motion, p. 11-12. However, in doing so, Defendants ignore the fact that even though there are video recordings of the incident that accurately capture the events that transpired, they do not disprove Plaintiff's claims "because the activity in the video is susceptible to more than one interpretation." *Dixon v. County of Roscommon*, 479 F. App'x 680, 682 (6th Cir. 2012).

Defendants' claims are actually controverted by the evidence contained in the videos. According to Defendants, and based on the evidence that they submitted in this case, only three officers (Schiller, Gillock, and Steffan) had physical contact with Brackens. However, the video clearly shows that more than three officers touched him while he was on the ground. Additionally, the video shows that more than one officer (only identified by Defendants as Officer Schiller) pushed Brackens against the van. In their facts, Defendants entirely ignore that Officer Meredith, after repeatedly changing his story about his involvement, admits to kneeling on Brackens while was being handcuffed. The video shows that Meredith was kneeling on Brackens head. (Moss In-Car Video, 1:39:33 to 1:39:45.)

13

The number of officers involved in the seizure of Brackens is important to a determination of the reasonableness of their actions. Given that Brackens was compliant, not resisting, laying prone on the pavement, with weapons pointed at him, while several officers handcuffed him, and one officer kneels on head neck, the reasonableness of Defendants' actions are in dispute and are issues of fact for a jury to decide. Courts have recognized that summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations. *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009).

Defendants cite to *Dunn v. Matatall*, 549 F.3d 348 (to support their argument that their conduct was reasonable under the circumstances. However, the complainant in *Dunn* was the *driver* of the vehicle that fled. Additionally, there were only two officers involved in the apprehension of the driver, and the injury he suffered was the result of an accidental fall, not the officers tackling him to the ground. There was a passenger in *Dunn*, but there is no information regarding any use of force against him. The only information is contained in a footnote wherein the Court recites: "A passenger was in the car with Dunn during the chase and when he was pulled over. The passenger did not exit the vehicle until after Dunn had been removed from the car and other officers had arrived on the scene." *Id.* 549 F.3d at 352. The Court in *Dunn* was not presented with the question of the reasonableness of force on that passenger. Therefore, it does not give guide for this case.

Based on the record, the risk posed by the elderly Brackens is disputed and debatable, and a reasonable jury could conclude that Brackens was not posing a "substantial and immediate risk" at the time multiple officers jumped on him while he was being handcuffed. *Scott*, 550 U.S. at 386. Many of the facts surrounding the use of force

against Brackens, viewed in the light most favorable to the plaintiffs, negate the risk factors central to the reasonableness findings.

### B. DEFENDANTS ARE NOT ENTITLED TO IMMUNITY BECAUSE ISSUES OF FACT REMAIN, WHICH ARE PERTINENT TO WHETHER THEY VIOLATED BRACKENS' CLEARLY ESTABLISHED RIGHTS

The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U. S. 730, 739, (2002). "Generally, summary judgment based on qualified immunity is proper if the officer was not on notice that his conduct was clearly unlawful. *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). However, if genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper." *O'Malley v. City of Flint*, 652 F.3d 662, 667 (6th Cir. Mich. 2011)(citing *Poe v. Haydon*, 853 F.2d 418, 425-26 (6th Cir. 1988)).

In determining whether Brackens had a clearly established right, the simple question for the Court to resolve is whether the level of force executed under the circumstances was *reasonable*. Therefore, this Court must consider whether or not the right to be free of excessive force employed in a search/seizure was a "clearly established" constitutional right at the time the physical force was executed upon the Plaintiff. Again, there are issues of material fact with regard to the actions of the defendants as well as what information they knew at the time the executed force upon Mr. Brackens, which makes it inappropriate for this Court to grant them summary judgment.

The right to be free from physical force when one is not resisting the police is a clearly established right. Additionally, by being merely present in a suspected car, a person does not lose "immunities from search of his person to which he would otherwise be

15

entitled." *United States v. Bell*, 762 F.2d 495, 499 (6th Cir. 1985)(Internal quotation marks omitted). Brackens' behavior did not give the officers any reason to suspect he was inclined to assault the officers. He did not have anything in his hands nor did he behave in a threatening manner. Defendants admit that Brackens complied with Officer Schiller's commands to show his hands just before he was brought out of the vehicle. There are no allegations that Mr. Brackens was resisting arrest or being combative. In fact, Mr. Brackens was not arrested or charged with anything related to the events of that morning. At the time he was seized, at least two officers had drawn their weapons and were aimed at him. There were nearly 20 officers present on the scene.

Additionally, Defendants offer no explanation for the additional use of force by the other officers beyond that of Schiller and Gillock. At the time Brackens was removed from the vehicle, at least three officers had their weapons drawn and pointed at him. He was not resisting Officer Schiller and Gillock's while they handcuffed him, nor was he being combative. Yet, two to three other officers jumped on top of Mr. Brackens, according to Defendants, "assist" in his detainment. At that time, Officer Meredith kneels on Mr. Brackens head, a fact entirely ignored by Defendants.

The number of officers, their knowledge, their exact role in taking down Mr. Brackens, and the force they used are disputed facts, which are material as their resolution bears directly on whether that use of force was reasonable response to the situation faced by the officers. Because these issues cannot be resolved on summary judgment, it is improper and must be denied.

### III. LOUISVILLE METRO IS LIABLE UNDER 1983 DUE TO ITS POLICY OF INADEQUATE TRAINING

In order for municipal liability to be found under *Monell v N.Y.C. Dept. of Social Services*, 436 U.S. 658 (1978), the Plaintiff must demonstrate that an official policy or custom caused her constitutional rights to be violated. Defendant then claims that "Plaintiff has failed to identify any 'policy or custom.'" In actuality, Plaintiff has identified that the lack of training by Defendants itself is an unconstitutional policy. The Supreme Court in *City of Canton, Ohio v. Harris* explained that, "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." 489 U.S. 378, 390 (1989). Where it can be said that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need...," the municipality will be liable. *Id.* The use of force is something that police officers encounter and must be prepared to calculate on a daily basis. Defendants actions, especially that of Officer Meredith, shows that they are inadequately trained to properly Moreover, per *Harris*, this inadequacy of training is equivalent to a policy or custom and thus the Plaintiff has met his burden under *Monell*.

### IV. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY REGARDING PLAINTIFF'S STATE CLAIMS

Because issues of exist, Defendants are not entitled to summary judgment regarding Plaintiff's state law claims. Kentucky law recognizes that an officer is privileged to use the amount of force that is necessary or that would appear to be reasonably necessary, under the totality of the circumstances, to make an arrest. *See, e.g., City of Lexington v. Gray*, 499

S.W.2d 72, 74 (Ky. 1973). For the reasons discussed in Section II, above, issues of fact remain, therefore, summary judgment on Plaintiff's state law claims is not proper.

"A person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instituted, he destroys, mutilates, conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding." KRS 524.100. In view the facts in light most favorable to the Plaintiff, Defendants' concealment of the events of April 21, 2011 by failing to provide requested evidence in response to Open Records Requests, failing to fill out a use of force form by LMPD officers when it was required under their SOPs violates KRS 524.100. As such, Plaintiff's claim cannot be dismissed.

## V.  CHOICE OF LAW FAVORS KENTUCKY LAW

JPD Officers argue that under Kentucky's choice of law analysis, Indiana has the most significant relationship. Defendant cite to *Wessling v. Paris*, 417 S.W.2d 259, 261 (Ky. 1967). In *Wessing*, a passenger filed a negligence action against appellee driver for personal injuries resulting from a collision while the parties, who were residents of Kentucky, were travelling in Indiana. The Jefferson Circuit Court (Kentucky) determined that the Indiana Guest Statute (Act), Ind. Code § 47-1021, applied as the law of the place where the collision occurred and granted summary judgment in favor of the driver. The Act protected drivers on Indiana highways from claims by passengers. The driver claimed, and the trial court agreed, that under the rule of law that the law of the state where an automobile accident occurred always governed the rights of the parties, the Act applied to the driver. On appeal, the court reexamined the rule of law applied by the trial court and found it to be

inapplicable to the case at bar. The court held that the better rule was that the local law of the state where the injury occurred determined the rights and liabilities of the parties, unless some other state had a more significant relationship with the occurrence and the parties as to the particular issue involved, in which event the local law of the latter state governed. The court determined that, because both parties were residents of Kentucky, because it was against the public policy of Kentucky to enact legislation such as the Act, and because the motor vehicle trip during which the collision occurred started and ended in Kentucky, Kentucky had a more significant relationship to the occurrence requiring that the law of Kentucky be applied. The same cannot be said for this case. Here, Kentucky's interest is high as the party was injured here and a multitude of LMPD officers were involved in the pursuit. Therefore, the choice of law favors Kentucky and Plaintiff was not required to file a ITCA.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motions for Summary Judgment.

                                                                                   Respectfully submitted,

                                                                                   */s/ Mellissa Eyre Yeagle*
                                                                                    Mellissa Eyre Yeagle
                                                                                    605 Marquette Dr.
                                                                                    Louisville, KY  40222
                                                                                    (502) 523-0999
                                                                                    mellissa.yeagle@gmail.com
                                                                                    *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on December 1, 2014, the above Response was electronically filed with the Clerk of the Court by using the CM/ECF filing system and copied to all registered CM/ECF participants in the above-styled action.

/s/ *Mellissa Eyre Yeagle*
Mellissa Eyre Yeagle
