UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ODELL BRACKENS, JR., as Personal
Representative of the Estate of Leon Brackens,                               Plaintiff,

v.                                                          Civil Action No. 3:12-cv-280-DJH-DW

LOUISVILLE JEFFERSON COUNTY
METRO GOVERNMENT, et al.,                                                 Defendants.

* * * * *

**MEMORANDUM OPINION AND ORDER**

This lawsuit arises out of a car chase in which Leon Brackens was an unwilling participant. The defendant police officers allegedly mistreated Brackens when the chase came to an end. All remaining defendants have moved for summary judgment. (Docket Nos. 64, 65, 66) Because the plaintiff has failed to demonstrate a genuine dispute of material fact with respect to any of his claims, the motions for summary judgment will be granted.

**I.      BACKGROUND**

The chase began with a traffic stop on April 21, 2011. Brackens was a passenger in a van driven by Rhonda Sullivan when the vehicle was pulled over by Jeffersonville, Indiana police, who had determined that there were outstanding felony warrants for Sullivan's arrest. While an officer stood at the driver's-side window of the van, Sullivan drove away. She led police on a chase through Clark and Floyd Counties in Indiana and several miles into Kentucky, ultimately coming to a stop on an exit ramp off of I-264 in Louisville. At various points in the chase, Sullivan exceeded 90 miles per hour, drove the wrong way, and took roads that were flooded. As the chase progressed into Kentucky, officers from the Louisville Metro Police Department (LMPD) joined the Jeffersonville Police Department (JPD) officers already in pursuit.

1

Brackens called 911 at least twice during the chase, telling operators that he was "scared for [his] life" and couldn't make Sullivan stop. (D.N. 76 Ex. 1, 0:35; *id.* Ex. 2 1:23) Early in the first call, Brackens exclaimed, "I can't get out; she's gonna kill me; please help." (*Id.* Ex. 1, 0:21) He stated that he "was just getting a ride from" Sullivan and didn't know why she was fleeing police. (*Id.*, 2:15; *id.* Ex. 2, 2:15) During his 911 calls, Brackens repeatedly said that he was "scared to death" and didn't want to die. (*E.g., id.* Ex. 1, 1:58; *id.* Ex. 2, 3:05)

Somehow, Brackens's pleas for help were mistranslated. For reasons that are not apparent from the record, LMPD dispatchers unequivocally described Brackens as a threat and the primary suspect.[1] They conveyed the following information to LMPD officers:

- "Occupants of the vehicle said they would try to run over officers and they wanted to die tonight. Male in vehicle's on the phone with Jeff PD. They have prior charges of handgun possession." (D.N. 67 Ex. 7, 1:48)
- "They want to do suicide by cop and they will attempt to run over police cars if they get in the way." (*Id.*, 2:27)
- "There's supposed to be a female in the vehicle, one of his friends who was just giving him a ride." (*Id.*, 4:07)
- "Apparently the female's not involved, but she is in the vehicle." (*Id.*, 4:24)
- "The female in the vehicle is yelling that she's scared to death." (*Id.*, 4:47)
- "He's taking the Breckenridge Lane exit." (*Id.*, 8:46)
- "He's back and forth right now." (*Id.*, 9:01)

As the chase ended, LMPD dispatch warned, "Use caution; they were saying they weren't going to be taken." (*Id.*, 9:29) The dispatcher emphasized the potential danger: "Subject

---

[1] It does not appear from the record herein that the plaintiff pursued claims or discovery related to this misinformation.

2

has warrants for escape second. He's suicidal and homicidal. Prior handgun charges. All units use extreme caution. All units use *extreme* caution." (*Id.*, 10:03)

JPD dispatch likewise advised officers that the van's occupants had called 911 "saying stuff about how they're gonna die." (D.N. 76 Ex. 3, 8:23) Although a JPD dispatcher initially specified that it was Sullivan who was wanted on felony warrants, a later report said simply, "Units advised: felony escape, handgun." (*Id.*, 21:43; *see id.*, 14:34) Like LMPD dispatch, JPD dispatch warned that the situation could be dangerous, advising "caution, previous charge of possession of a handgun, escape second degree, probation violation." (*Id.*, 21:49) JPD officers were also told that "the occupant of the vehicle" was in communication with LMPD and "they[] [were] trying to negotiate." (*Id.*, 23:02)

The plaintiff "does not dispute Defendants' recitation of the facts in LMPD's Motion from the time the pursuit ended in Louisville, Kentucky until the moment Mr. Brackens [was] brought out of the vehicle." (D.N. 74, PageID # 798-99) Those facts can be summarized as follows. When the van finally stopped on the Breckenridge Lane exit ramp, Sullivan exited the vehicle and was handcuffed by Defendants Schiller and Moss. (D.N. 64-1, PageID # 523) LMPD officers ordered Brackens to get out of the van multiple times, but he did not comply. (*Id.*) With other officers providing cover, Schiller opened the van's passenger door. (*Id.*) He "told Brackens to keep his hands visible[,] and [Brackens] complied." (*Id.*, PageID # 523-24) After unfastening Brackens's seatbelt, Schiller removed Brackens from the vehicle. (*Id.*, PageID # 524)

The remainder of the incident was captured on the dash-cam videos of Defendants Madison (LMPD) and Moss (JPD).[2] The latter offers a clearer view. It shows Brackens being pulled from the van by Schiller and forced to the ground by Schiller and Defendant Gillock. (D.N. 67 Ex. 2, 23:54) Two other officers quickly approach and hold Brackens down while he is being handcuffed; one officer's knee is on Brackens's head for a few seconds.[3] (*Id.*, 23:59) Brackens does not resist. After Brackens is handcuffed, two officers attempt to lift him and stand him up against the van. (*Id.*, 24:14) They appear to be struggling, and another officer approaches to assist. (*Id.*, 24:20) When pushed against the van, Brackens collapses, and the officers again attempt to stand him upright to search him. (*Id.*, 24:27-35) Brackens is again unable to stand, and the officers lower him to the ground in a seated position, then pat him down. (*Id.*, 24:50) Brackens remains seated for the rest of the video, with two officers' hands on his shoulders.

Sadly, Brackens suffered fractures of his left femur and left humerus during the incident. (D.N. 64-14, PageID # 627) A forensic medical review of Brackens's medical records and other evidence concluded that the fractures "were accidental in nature and occurred due to the severe osteopenic state of his bones." (*Id.*, PageID # 628; *see id.*, PageID # 627 (noting that Brackens had "body wide 'severe' and 'diffuse' osteopenia and demineralization of his bones")) The reviewer, Dr. William S. Smock, found "no evidence of any strikes or blows" or excessive force

---

[2] The plaintiff acknowledges that these videos "accurately capture the events that transpired." (D.N. 74, PageID # 809)

[3] These officers were likely Defendants Steffan, who stated in a professional standards unit (PSU) interview that he recalled grabbing Brackens's arm and positioning it so that other officers could handcuff him (D.N. 64-10, PageID # 604-05), and Meredith, who acknowledged based on the video that "when [he] kneeled down [he] could have leaned against" Brackens. (D.N. 74-7, PageID # 856)

used on Brackens during his removal from the vehicle. (*Id.*) The plaintiff offers no evidence to refute these conclusions.

In his third amended complaint, the plaintiff asserts claims of excessive force by the officers and inadequate training by Louisville Jefferson County Metro Government ("Louisville Metro") pursuant to 42 U.S.C. § 1983. (D.N. 14, PageID # 226-28) He further alleges conspiracy under 42 U.S.C. § 1985 on the ground that the defendants "conspired to violate [Brackens's] [c]onstitutional rights by setting the events into action, by depriving [him] of his rights, and by many attempts to conceal their illegalities by tampering with evidence." (*Id.*, PageID # 228) The complaint also asserts that the defendants' actions constituted excessive execution, assault, battery, and false imprisonment under Kentucky law, as well as official misconduct under Kentucky Revised Statutes §§ 533.030 and 522.030. (*Id.*, PageID # 229) The plaintiff concedes that there is insufficient evidence to support the wrongful-death claim asserted in Count IV of the third amended complaint. (*See* D.N. 74, PageID # 807 n.11)

## II.    STANDARD

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* 56(c)(1). For purposes of summary judgment, the Court generally views the facts in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). But where, as here, the disputed facts are captured on a video whose accuracy is not in question, the Court must take the facts in the light depicted by the video. *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Standifer v. Lacon*, 587 F. App'x 919, 920 (6th Cir. 2014)).

In determining whether there is a genuine dispute of material fact, the Court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3); *see Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). To demonstrate a genuine dispute precluding summary judgment, the nonmoving party "must present significant probative evidence tending to support [his] version of the facts, *evidence* on which a reasonable jury could return a verdict for [him]." *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009) (citing *Scott*, 550 U.S. at 380-81). If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be deemed undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2)-(3). To survive a motion for summary judgment, the nonmoving party must establish a genuine dispute of material fact with respect to each element of each of his claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

### III.   ANALYSIS

The defendants attack each of the claims asserted in the Third Amended Complaint. The plaintiff has presented insufficient evidence to support any of his claims.

####   A.   § 1983

The plaintiff asserts that the LMPD and JPD officers "used excessive physical force, assaulted, battered, and falsely imprisoned" him, which amounted to an unreasonable search and seizure within the meaning of the Fourth and Fourteenth Amendments. (D.N. 14, PageID # 227; *see id.*, PageID # 226)  In addition, he contends that Louisville Metro is liable under § 1983 because it "failed to adequately train and supervise" the LMPD officers. (*Id.*, PageID # 227)

### 1.     Officers

As an initial matter, there is no evidence to support a § 1983 claim against Defendants Ashenfelter, Madison, Hamlin, Hamilton, Glass, Ward, Moss, Grimm, or Ashabranner.  Each of these officers denied having any physical contact with Brackens on the night in question, and the plaintiff has presented no evidence refuting those statements.  (*See* D.N. 64-17 (LMPD officers' responses to requests for admission); D.N. 66-4, PageID # 737 (Moss affidavit); D.N. 66-5, PageID # 740 (Grimm affidavit); D.N. 66-6, PageID # 743 (Ashabranner affidavit))  Furthermore, the only evidence that Defendant Hernandez was even present at the scene is his own initial statement that he thought he recognized himself in a video of the incident.  (*See* D.N. 64-15, PageID # 633-34)  Hernandez consistently denied having any recollection of the events shown in the video (*see id.*), and after watching a clearer video, Hernandez stated that he was not one of the officers who participated.  (D.N. 64-16, PageID # 637-38)  The plaintiff has not offered any evidence that Hernandez was in fact present or that he engaged in any conduct that violated Brackens's constitutional rights.

To be liable under § 1983, an officer must have personally committed a constitutional violation. *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) (explaining that for purposes of a § 1983 claim, it is "critical" that the plaintiff "demonstrate 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009))); *see also Wilson v. Morgan*, 477 F.3d 326, 337 (6th Cir. 2007) ("[O]nly officers with direct responsibility for the challenged action may be subject to § 1983 liability.").  Accordingly, the Court will consider the § 1983 claims only with respect to Defendants Steffan, Schiller, Meredith, and Gillock—the only officers whom the evidence shows had physical contact with Brackens.

In his consolidated response to the summary judgment motions, the plaintiff asserts that the following five actions violated Brackens's constitutional rights:

> (1) Defendants Schiller and Gillock used excessive force to effectuate the seizure by pulling Brackens out of [the] vehicle in a violent manner while he was held at gunpoint; (2) multiple officers pounced on him while he was not resisting; (3) Officer Meredith kneeing him in the face when he was on the ground not resisting; (4) pushing him up against the van not once, but twice, while they "searched" him; (5) using handcuffs to detain Brackens after they "searched" him and determined he was handicapped and posed no risk.

(D.N. 74, PageID # 808-09) The defendants maintain that they are entitled to qualified immunity for their actions.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether qualified immunity applies, the Court engages in a two-step inquiry, asking whether the plaintiff has presented facts demonstrating a violation of a constitutional right and "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Either step may be addressed first. *Id.* at 236; *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). Here, the Court concludes that the plaintiff has not shown that the defendants violated any constitutional right.

Claims of excessive force are analyzed under a standard of reasonableness. *Plumhoff*, 134 S. Ct. at 2020. The Court must consider whether an officer's actions were reasonable given the "totality of the circumstances," viewing the situation "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This approach takes into account "the fact that police

8

officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 396-97). "Relevant considerations include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008) (internal quotation marks omitted) (quoting *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007)). Reasonableness is a question of law, not a factual issue for a jury. *Id.* at 353 (citing *Scott*, 550 U.S. at 381 n.8).

In *Dunn v. Matatall*, the Sixth Circuit addressed facts similar to those at issue here. The plaintiff in *Dunn* had led police on a two-minute car chase, speeding and running stop signs, after an officer attempted to pull him over. *Id.* at 350-51. When the chase ended, two officers forcibly removed Dunn from the car after he failed to comply with their orders to get out of the vehicle. *Id.* at 351. One of the officers lost his grip and Dunn fell to the ground, fracturing his femur. *Id.* Dunn argued that the officers used excessive force against him. *See id.* at 352.

The Sixth Circuit found that the officers "acted reasonably in attempting to neutralize a perceived threat by physically removing Dunn from his vehicle" because Dunn had fled from police and then "appeared to refuse the [o]fficers' commands to exit the car." *Id.* at 354. The court noted that "Dunn's conduct in fleeing gave the [o]fficers reason to be especially suspicious of Dunn once he finally did pull over." *Id.* His flight also suggested that he posed a threat to the officers' safety: "[i]t would have been reasonable for the [o]fficers to be apprehensive that Dunn may have a weapon in the car, that the passenger may have a weapon, or that the car may be used as a weapon." *Id.* Thus, "[a] reasonable officer on the scene would have believed that the threat posed by Dunn was not contained until Dunn was out of the car and handcuffed." *Id.* Moreover,

9

Dunn's hesitation in exiting the vehicle indicated that he was resisting arrest. *See id.* at 354-55. Ultimately, the court concluded that "given the heightened suspicion and danger brought about by the car chase and the fact that an officer could not know what other dangers may have been in the car, forcibly removing Dunn from the car to contain those potential threats was objectively reasonable." *Id.* at 355.

This Court likewise finds that the force used in removing Brackens from the van was reasonable under the circumstances. Based on the information LMPD officers had received from dispatch, Brackens posed extreme danger to himself and others. (*See supra* Part I) Schiller and the other JPD officers had also been advised that Brackens might be dangerous. (*Id.*) Moreover, like the plaintiff in *Dunn*, Brackens seemingly ignored officers' repeated orders to exit the vehicle. (D.N. 64-1, PageID # 523)

Perhaps most significantly, Brackens was a passenger in a vehicle that had just led police on a high-speed chase through three counties in two states. At the time he was removed from the vehicle, the officers were unsure of his role in the chase—based on the information conveyed by dispatchers, many of the officers likely believed that Brackens had forced Sullivan to flee. (*See* D.N. 67 Ex. 7, 4:07 ("There's supposed to be a female in the vehicle, one of his friends who was just giving him a ride."); *id.*, 4:24 ("Apparently the female's not involved, but she is in the vehicle."); *id.*, 4:47 ("The female in the vehicle is yelling that she's scared to death.")) Likewise, the fact that multiple LMPD officers restrained Brackens after he was out of the vehicle was reasonable in light of the information they had been given via dispatch suggesting that he posed a serious threat and was responsible for the chase.

Although there were several officers kneeling around Brackens while he was on the ground, the video does not support the plaintiff's assertion that Brackens was kneed in the face.

(*See* D.N. 74, PageID # 809)  In the video, one officer is seen kneeling on Brackens's head for a few seconds as he is being handcuffed.  (D.N. 67 Ex. 2, 23:58)  Meredith's statement that it appeared from the video that "when [he] kneeled down [he] could have leaned against [Brackens]" suggests that he is the officer whose knee was on Brackens's head; however, Meredith denied striking Brackens with his knee, and the video does not show any officer doing so.  (D.N. 74-7, PageID # 856; *see id.*, PageID # 857)  Notably, the plaintiff does not point to video footage or any other evidence in support of his assertion that Meredith "knee[d] [Brackens] in the face"; instead, he cites the video as showing Meredith "kneeling on Brackens['s] head." (D.N. 74, PageID # 809)  The video shows that Meredith's knee was on Brackens only briefly, as Brackens was being handcuffed.  Again, given the information the officers had when Brackens was removed from the car, it was reasonable to restrain him until he was handcuffed.  *See Dunn*, 549 F.3d at 354.

Nor did the officers act unreasonably in "pushing [Brackens] up against the van not once, but twice" to search him.  (D.N. 74, PageID # 809)  The video shows that Brackens collapsed after the first attempt to stand him up against the van.  (*See* D.N. 67 Ex. 2, 24:14-35)  He offers no evidence that the officers were aware that his leg was injured when they attempted to stand him up a second time; in light of the car chase and his failure to comply with officers' commands to exit the vehicle, they could reasonably have assumed that he was being uncooperative by refusing to stand.  And after two attempts, the officers carefully placed Brackens on the ground. (*See id.*, 24:50)  The video does not reflect any gratuitous pushing.  In any event, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Dunn*, 549 F.3d at 355 (quoting *Graham*, 490 U.S. at 396).  The Court

finds that the officers did not act unreasonably in pushing Brackens against the van to search him.

Finally, the plaintiff has not shown that the use of handcuffs until EMS arrived amounts to excessive force. He presents no evidence that the officers knew by that point that Brackens was not wanted on felony warrants or responsible for the car chase that had just ended, as they had previously been informed. Nor does he contend that Brackens was harmed by the handcuffs or was in distress and the officers ignored him. There is no evidence regarding how much time elapsed between the time Brackens was placed on the ground and the time paramedics arrived, and the plaintiff does not contend that Brackens was made to wait, handcuffed, for an unduly long period. In short, the plaintiff has failed to show that there was anything objectively unreasonable about keeping Brackens handcuffed until the ambulance arrived.

### 2. Louisville Metro (Failure to Train)

Nor is Louisville Metro liable under § 1983 for failing to adequately train its officers. (*See* D.N. 74, PageID # 813) The Supreme Court recognized in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), that a municipality "may be held liable for the constitutional violations of [its] employees only where the municipality's policy or custom led to the violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Monell*, 436 U.S. at 694-95). Thus, "[t]here can be no liability under *Monell* without an underlying constitutional violation." *Id.* (citing *Scott v. Clay Cty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000)). Since, as explained above, the plaintiff has failed to establish a constitutional violation by any of the LMPD officers, Louisville Metro cannot be held liable.

In any event, the plaintiff has not presented evidence demonstrating that Brackens's injuries resulted from any policy or custom of Louisville Metro. To prevail on a claim of failure

to train, a plaintiff must prove "(1) 'that a training program is inadequate to the tasks that the officers must perform'"; (2) 'that the inadequacy is the result of the [defendant]'s deliberate indifference'; and (3) 'that the inadequacy is closely related to or actually caused the plaintiff's injury.'" *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (other internal quotation marks omitted) (quoting *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)). Deliberate indifference is established when the plaintiff points to "prior instances of unconstitutional conduct demonstrating that the [defendant] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Id.* (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). A single constitutional violation may also satisfy the deliberate-indifference prong, provided it is "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Id.* (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)).

      Here, the plaintiff merely asserts that "[t]he use of force is something that police officers encounter and must be prepared to calculate on a daily basis. Defendants['] actions, especially that of Officer Meredith, show[] that they are inadequately trained to properly [sic]." (D.N. 74, PageID # 813) A bare assertion that there is an "obvious need for more or different training" is not enough to establish deliberate indifference. *Plinton*, 540 F.3d at 465 (rejecting plaintiff's conclusory assertion that need for additional training was "obvious" and noting that "deliberate indifference is a 'stringent standard of fault'" (quoting *Brown*, 520 U.S. at 410)). Thus, even if the plaintiff could demonstrate that a constitutional violation occurred, his claim against Louisville Metro would fail.

13

### C. § 1985 (Conspiracy)

The plaintiff offers no argument or evidence in support of his conspiracy claim under 42 U.S.C. § 1985. To sustain such a claim, a plaintiff must establish

> (1) a conspiracy involving two or more persons, (2) for the purpose of depriving, directly or indirectly, a person or class of persons the equal protection of the laws[,] and (3) an act in furtherance of that conspiracy (4) that causes injury to person or property, or a deprivation of a right or privilege of a United States citizen.

*Taylor v. Streicher*, 465 F. App'x 414, 419 (6th Cir. 2012) (quoting *White v. Trapp*, 93 F. App'x 23, 26 (6th Cir. 2004)); *see* 42 U.S.C. § 1985(3). The claim also requires evidence "that the conspiracy was motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.* (quoting *White*, 93 F. App'x at 26). As the plaintiff has not even attempted to satisfy these elements, summary judgment is appropriate on his § 1985 claim of conspiracy.

### D. State Law Claims

The plaintiff offers little argument on his state law claims, which fail as to all defendants.

#### 1. LMPD Defendants

The LMPD officers argue that they are also entitled to qualified immunity under Kentucky law on the plaintiff's state law claims.[4] "Under Kentucky law, when sued in their individual capacities, 'public officers and employees enjoy only qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment.'" *Bouggess v. Mattingly*, 482 F.3d 886, 897 (6th Cir. 2007) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). "[A] finding of 'bad faith can be predicated

---

[4] The plaintiff does not challenge the defendants' assertion that Louisville Metro has sovereign immunity with respect to his state law claims. (*See* D.N. 64-1, PageID # 537; D.N. 74, PageID # 813-14)

on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known . . . i.e., objective unreasonableness.'" *Id.* (quoting *Yanero*, 65 S.W.3d at 523). A plaintiff can also demonstrate bad faith by showing that the officer acted with willful or malicious intent to harm him or with a corrupt motive. *Id.*

According to the plaintiff, "summary judgment on [his] state law claims is not proper" because "issues of fact remain." (D.N. 74, PageID # 814) As discussed above, however, the officers' actions were not objectively unreasonable. And the plaintiff offers no evidence that the officers acted with malicious intent or a corrupt motive. *See Bouggess*, 482 F.3d at 897. The LMPD officers are therefore entitled to qualified official immunity on the state law claims.

The plaintiff also maintains that the facts establish a violation of Kentucky Revised Statutes § 524.100, which provides that

> [a] person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instituted, he:
>
> (a) Destroys, mutilates, conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding; or
>
> (b) Fabricates any physical evidence with intent that it be introduced in the official proceeding or offers any physical evidence, knowing it to be fabricated or altered.

Ky. Rev. Stat. § 524.100(1). The only evidence cited in support of this claim is correspondence between the plaintiff's counsel and LMPD regarding open records requests. (*See* D.N. 74, PageID # 805-06; D.N. 74-13) According to the plaintiff, LMPD's delays in producing records related to the incident and its failure to produce a "use of force form" are "indicative of an overall scheme to cover-up the events of April 21, 2011." (D.N. 74, PageID # 806) He does not

15

point to conduct by any of the defendants that would violate the statute, however; nor does he explain how he was injured by any such violation. *See* Ky. Rev. Stat. § 446.070 ("A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation . . . ."). In short, the plaintiff has failed to establish a genuine dispute of material fact as to his claim of tampering with physical evidence.

### 2. JPD Defendants

The JPD defendants assert that Indiana law, not Kentucky law, applies to them and that the plaintiff's state law claims are barred because he did not comply with the Indiana Tort Claims Act. (*See* D.N. 66-1, PageID # 689) "A federal court exercising supplemental jurisdiction is bound to apply the law of the forum state, including its choice of law rules." *Boggess v. Price*, No. 04-5761, 2005 U.S. App. LEXIS 11281, at *14 (6th Cir. June 10, 2005) (quoting *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998)). Kentucky's choice-of-law rules strongly favor the application of Kentucky law: "When the court has jurisdiction of the parties[,] its primary responsibility is to follow its own substantive law. The basic law is the law of the forum, which should not be displaced without valid reasons." *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972). Thus, "if there are significant contacts—not necessarily the most significant contacts—with Kentucky, the Kentucky law should be applied." *Id.* The Court should not engage in a "weighing of interest," but instead must simply determine "whether Kentucky ha[s] 'enough' or 'sufficient' contacts to justify applying Kentucky law." *Id.* (quoting *Arnett v. Thompson*, 433 S.W.2d 109, 113 (Ky. 1968)).

Kentucky has significant contacts in this case. Much of the chase took place in Kentucky, and Kentucky is where the defendants' alleged wrongdoing and Brackens's injuries occurred. While Indiana also has significant contacts, Kentucky's contacts are "sufficient . . . to

justify applying Kentucky law" to the state law claims against the JPD defendants. *Id.* (internal quotation marks omitted).

Yet although he argues for the application of Kentucky law, the plaintiff does not point to any evidence supporting his state law claims against the JPD defendants. (*See* D.N. 74, PageID # 814-15) Rather, he simply asserts that "issues of fact remain" with respect to whether the officers' use of force was reasonable. (*Id.*, PageID # 813; *see id.*, PageID # 814) Again, the video evidence establishes that the officers' conduct was not unreasonable. Because the plaintiff has failed to present evidence to support these claims, they also fail.

## IV.   CONCLUSION

An unfortunate miscommunication regarding Brackens's involvement in the chase led the defendants to treat him as though he posed a serious threat. The plaintiff has not shown that the defendants' actions were objectively unreasonable, nor has he presented evidence to support his other claims. Accordingly, it is hereby

**ORDERED** that the motions for summary judgment of the LMPD defendants and Louisville Metro (D.N. 64), Brian Gillock (D.N. 65), and the JPD defendants (D.N. 66) are **GRANTED**. A separate judgment will be entered this date.